## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re: | |
| | Bankruptcy Case No. 23-13019 TBM |
| HEART HEATING AND COOLING, LLC, | Chapter 11 (Subchapter V) |
| | |
| Debtor. | |

## MEMORANDUM OPINION AND ORDER
## ON CHAPTER 11 (SUBCHAPTER V) ELIGIBILITY

### I.      Introduction.

A few years ago, Congress enacted a major addition to Chapter 11 of the Bankruptcy Code[1]:  the Small Business Reorganization Act of 2019 (the "SBRA").[2]  The SBRA (commonly referred to as "Subchapter V"), was designed to streamline the reorganization and rehabilitation process for small business debtors.  Substantively, the SBRA lowered the Chapter 11 bar for confirmation of a plan of reorganization by permitting confirmation even if all classes of creditors reject the proposed plan and by eliminating the so-called "absolute priority rule."  Procedurally, Congress simplified some of the more cumbersome aspects of standard Chapter 11 cases by eliminating unsecured creditors' committees and disclosure statements.  Suffice it to say that the SBRA offers many potential advantages for qualifying Chapter 11 debtors.

But, Subchapter V is not for everybody.  The eligibility requirements for debtors seeking to file bankruptcy under Subchapter V are set forth in Section 1182(1)(A) and include a debt cap:  the debtor "*has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the order for relief in an amount not more than $7,500,000 (excluding debts owed to 1 or more affiliates or insiders) . . . .*" (emphasis added).

This dispute involves the eligibility of the Debtor, Heart Heating and Cooling, LLC (the "Debtor"), to utilize Subchapter V.  When the Debtor sought bankruptcy protection under Chapter 11 on July 11, 2023, the Debtor elected to proceed under Subchapter V.  Shortly thereafter, the Debtor filed its initial Schedule D, listing secured debt of $6,809,138.83.  Of such amount, the Debtor asserted $2,523,694.61 was contingent or unliquidated, leaving a balance of $4,285,444.22 as *aggregate noncontingent liquidated*

---

[1]      All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

[2]      Pub L. No. 116-54, 133 Stat. 1079 (mainly codified at 11 U.S.C. §§ 1181-1195).

*secured debt*.  Then, on its initial Schedule E/F, the Debtor listed unsecured debt of $4,364,295.69.  Of such amount, the Debtor asserted $2,115,051.60 was contingent or unliquidated, leaving a balance of $2,249,244.09 as *aggregate noncontingent liquidated unsecured debt*.  By characterizing a very significant portion of its overall debt pool ($4,638,746.21) as contingent or unliquidated, the Debtor appeared to come in under the $7,500,000.00 statutory debt cap for Subchapter V eligibility.  But the issue raised eligibility suspicions from the get-go.

On September 7, 2023, the United States Trustee (the "UST") filed an "Objection to Debtor's Designation as a Debtor Under 11 U.S.C. § 1182 and Election to Proceed Under Subchapter V" (the "Eligibility Objection").[3]  The UST contends that the Debtor is ineligible for Subchapter V relief because the Debtor's aggregate noncontingent liquidated secured and unsecured debts exceeded $7,500,000.00 when the Debtor started its bankruptcy case.  After the Eligibility Objection, the Debtor made wholesale amendments to its Schedules D and E/F seemingly designed to bolster its eligibility position by eliminating, reducing, or recharacterizing its debt.  Then, the Debtor filed its "Response to the United States Trustee's Objection to Debtor's Designation as a Debtor Under 11 U.S.C. § 1182 and Election to Proceed Under Subchapter V" (the "Response"),[4] opposing the Eligibility Objection.  The Court conducted a trial on the Eligibility Objection and Response on January 24, 2024.

Having considered the evidence (primarily stipulations and documents) as well as the arguments presented by the UST and the Debtor, the Court determines that the Debtor is not eligible to proceed in Subchapter V because the Debtor's aggregate noncontingent liquidated debts as of the petition date exceeded $7,500,000.00.  Thus, the Court strikes the Debtor's Subchapter V designation.  The bankruptcy case will proceed as a standard Chapter 11 reorganization.

## II.   <u>Jurisdiction and Venue</u>.

This Court has jurisdiction to enter final judgment on the eligibility issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334.  Eligibility for relief under Chapter 11 (Subchapter V) is a core matter under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate) and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Both the Debtor and the UST concur that this Court has jurisdiction to issue final judgment on the eligibility dispute and that venue is proper in the Court.[5]

---

[3]     Docket No. 113.  The Court will refer to specific documents from the CM/ECF docket for this bankruptcy case, *In re Heart Heating and Cooling, LLC*, Case No. 23-13019 (Bankr. D. Colo.), using the convention: "Docket No. ___."

[4]     Docket No. 172.

[5]     Docket No. 226, Stip. Fact (Background and Procedural History) No. 16.

### III.    Procedural Background.

#### A.    The Bankruptcy Filing and Subchapter V Election.

The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on July 11, 2023 (the "Petition Date").[6]  In Section 8 of its Petition, the Debtor checked the box for "Chapter 11" and stated:

> The debtor is a debtor as define in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.**[7]

The Court refers to the Debtor's decision to proceed under Chapter 11 (Subchapter V) as the "Subchapter V Election."  On October 9, 2023, the Debtor filed its "Plan of Reorganization for Small Business Under Subchapter V of Chapter 11" (the "Subchapter V Plan").[8]  The Subchapter V Plan has not been confirmed.

#### B.    The Eligibility Objection and Response.

The UST objected to the Debtor's Subchapter V Election by filing the Eligibility Objection.[9]  The central thrust of the Eligibility Objection is that the Debtor had "aggregate noncontingent liquidated secured and unsecured debts", exceeding $7,500,000.00 as of the Petition Date.  The UST contends that the Debtor wrongfully characterized a substantial portion of its debt as "contingent" or "unliquidated" to avoid the Section 1182(1) debt cap.

The Debtor filed the Response to the Eligibility Objection, contesting the UST's position and arguing that the Debtor correctly elected to proceed under Subchapter V since the Debtor's "aggregate noncontingent liquidated secured and unsecured debts" are below $7,500,000.00.[10]  The Debtor contends that it properly excluded a significant amount of debt from its Subchapter V eligibility calculation because such debts are "contingent" or "unliquidated."

#### C.    The Hearings.

The Court conducted a preliminary non-evidentiary hearing on the Eligibility Objection and Response on November 6, 2023.[11]  Both the UST and the Debtor requested an opportunity to present evidence.  Accordingly, the Court set the contested issue of the Eligibility Objection and Response for a trial on January 23, 2024.

---

[6]     Docket No. 1; Ex. 1.
[7]     Docket No. 1 § 8; Ex. 1 § 8 (emphasis in original).
[8]     Docket No. 174.
[9]     Docket No. 113.
[10]    Docket No. 172.
[11]    Docket No. 197.

Additionally, the Court set pre-trial deadlines for the exchange of exhibits as well as filing of witness and exhibit lists, stipulations of facts and exhibits, and legal briefs.[12]

Thereafter, the parties submitted their "Stipulated Statement of Facts of the United States Trustee and the Debtor," which included an agreed statement of background and procedural history as well as a set of 58 stipulated facts (the "Stipulated Facts").[13]  Subject to certain limitations, the UST and the Debtor also stipulated to the admission into evidence of Joint Exhibits 1-33.[14]  Additionally, the UST and the Debtor filed legal briefs on the Subchapter V Election issues.[15]

Given the comprehensive set of evidentiary stipulations, the UST and the Debtor jointly requested that the Court vacate the trial.[16]  However, the Court declined such request and conducted the trial on January 24, 2024.[17]  At the trial, the Court admitted into evidence the Stipulated Facts and Joint Exhibits 1-33 (subject to certain agreed limitations).  The Debtor's Chief Executive Officer, Robert Michael Townsend, also testified.  After the conclusion of the evidence, the Court heard fulsome closing arguments from both the UST and the Debtor and took the dispute over the Subchapter V Election under advisement.  In the interim since the trial, the Court has reviewed all the admitted evidence (the Stipulated Facts and Joint Exhibits), considered the testimony, and evaluated the legal issues.  The Subchapter V eligibility issues are now ripe for decision.

## IV.   Factual Findings.

Based upon the Stipulated Facts, the Joint Exhibits, and the trial testimony, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

## A.   The Debtor's Business.

The Debtor, a Colorado limited liability company, is a "heating, cooling, plumbing, and electric sales, service, and repair company founded in 2019.  The Debtor offers residential and commercial services in the Front Range Area, from Fort Collins to Colorado Springs."[18]  The Debtor has many dozens of employees.[19]  It operates from two leased offices located in Colorado Springs and Lakewood, Colorado.[20]  The Debtor earned "gross revenue" from "operating a business" in the following amounts: (1)

---

[12]   *Id.*
[13]   Docket No. 226.
[14]   *Id.*
[15]   Docket Nos. 229 and 230.
[16]   Docket No. 228.
[17]   Docket Nos. 231 and 233.
[18]   Stip. Fact (Background and Procedural History) No. 7.
[19]   Docket No. 250 (Debtor asserts that it had 108 employees as of the Petition Date and 68 employees as of January 2024).
[20]   Stip. Fact (Background and Procedural History) No. 8.

$5,793,536.30 in 2023 through the Petition Date; (2) $12,137,052.01 in 2022; and (3) $8,681,240.00 in 2021.[21]

## B.    Debts Listed in the Debtor's Initial Schedules D and E/F.

Bankruptcy debtors are obligated to list their secured liabilities on Schedule D and their unsecured liabilities on Schedule E/F.  The Debtor filed its initial Schedule D on the Petition Date, identifying 73 secured claims (the "Initial Schedule D").[22]  On its Initial Schedule D, the Debtor asserted that the aggregate amount of secured claims against the Debtor as of the Petition Date was $6,809,138.83.[23]  Schedule D requires debtors to check a box if the listed claim is "contingent," "unliquidated," or "disputed."  The Debtor checked the "contingent" and/or "unliquidated" boxes for eight claims aggregating $2,523,694.61.[24]  (The majority of such claims were for debts the Debtor characterizes as "merchant cash advance" "loans.")  Thus, the remaining secured debt not listed as "contingent" or "unliquidated" was $4,285.444.22.

The Debtor filed its initial Schedule E/F on the Petition Date, identifying 44 general unsecured secured claims (the "Initial Schedule E/F").[25]  On its Initial Schedule E/F, the Debtor asserted that the aggregate amount of general unsecured claims against the Debtor as of the Petition Date was $4,364,295.69.[26]  Schedule E/F requires debtors to check a box if the listed claim is "contingent," "unliquidated," or "disputed."  The Debtor checked the "contingent" and/or "unliquidated" boxes for 13 claims aggregating $2,115,051.60.[27]  Thus, the remaining general unsecured debt not listed as "contingent" or "unliquidated" was $2,249,244.09.

Combining Initial Schedules D and E/F, the Debtor identified total liabilities of $11,173,434.52.  Of such amount, the Debtor asserted $4,638,746.21 was "contingent" or "unliquidated," leaving a remaining balance of $6,534,688.31.[28]  On this basis, the Debtor alleged that its aggregate noncontingent liquidated secured and unsecured debt as of the Petition Date was below $7,500,000.00.[29]

---

[21]    Ex. 1 at 65.
[22]    Ex. 1 at 22-51.
[23]    *Id*. at 51.
[24]    Ex. 1 at 22-51.  The following Claims were listed as "contingent" or "unliquidated" on Schedule D: Claim Nos. 2.9 ($447,900.00), 2.10 ($196,075.00), 2.18 ($128,078.54), 2.69 ($518,700.00), 2.70 ($13,088.00), 2.71 ($54,590.00), 2.72 ($334,769.98), and 2.73 ($830,493.09).
[25]    Ex. 1 at 52-59.
[26]    *Id*. at 59.
[27]    Ex. 1 at 52-59.  The following Claims were listed as "contingent" or "unliquidated" on Schedule E/F:  Claim Nos. 3.1 ($15,612.66), 3.3 ($40,873.87), 3.4 ($12,652.55), 3.5 ($13,213.56), 3.9 ($100,000.00), 3.15 ($16,421.56), 3.17 ($55,399.62), 3.19 ($250,000.00), 3.22 (Unknown), 3.23 ($947,878.80), 3.26 ($55,040.62), 3.27 ($189,873.40), and 3.35 ($418,085.36).
[28]    Ex. 1 at 22-59; Stip. Fact No. 1.
[29]    Initial Schedules D and E/F also contained a material error.  The Debtor counted one debt twice.  On Schedule D the Debtor identified a claim (Claim No. 2.25) owed to Libertas Funding, LLC, in the amount of $1,034,120.27.  Ex. 1 at 31.  However, on Schedule E/F, the Debtor identified a claim (Claim No. 3.23) owed to Kinetic/Webbank in the amount of $947,878.80.  Ex. 1 at 56.  The Debtor and the UST agree that Claim Nos. 2.25 and 3.23 are for the same obligation.  Stip. Fact No. 1.

C.    **Debts Listed in the Debtor's Amended Schedules D and E/F.**

In response to the Eligibility Objection, the Debtor made wholesale changes to its Initial Schedules D and E/F to try to improve its eligibility position.  The Debtor changed at least 73 claims from Initial Schedules D and E/F to: (1) delete claims; (2) reduce the dollar amount of claims; (3) change the dollar amount of claims to "unknown"; or (4) change the dollar amount of claims to "$0.00."

On September 29, 2023, the Debtor filed its amended Schedule D and identified just 28 secured claims (the "Amended Schedule D").[30]  On its Amended Schedule D, the Debtor asserted that the aggregate amount of secured claims against the Debtor as of the Petition Date was only $2,710,681.94[31] instead of the $6,809,138.83 alleged in its Initial Schedule D.  So, the Debtor slashed its secured debt by about 60% once its eligibility was questioned.  On its Amended Schedule D, the Debtor checked the "contingent" and/or "unliquidated" boxes for seven claims aggregating $940,614.00.[32]  Thus, the remaining secured debt not listed as "contingent" or "unliquidated" was only $1,770,067.94 per the Debtor.

On September 29, 2023, the Debtor filed its amended Schedule E/F and identified 51 general unsecured claims (the "Amended Schedule E/F").[33]  On its Amended Schedule E/F, the Debtor asserted that the aggregate amount of unsecured claims against the Debtor as of the Petition Date was $4,150,494.37[34] instead of the $4,364,295.69 alleged in its Initial Schedule E/F.  On its Amended Schedule E/F, the Debtor checked the "contingent" and/or "unliquidated" boxes for 15 claims aggregating $2,029,662.65.[35]  Thus, the remaining general unsecured debt not listed as "contingent" or "unliquidated" was $2,120,831.72.

Combining Amended Schedules D and E/F, the Debtor identified total liabilities of $6,861,176.31.  Of such amount, the Debtor asserted $2,970,276.65 was "contingent" or "unliquidated," leaving a remaining balance of $3,890,899.66.[36]  On this basis, the Debtor again alleged that its aggregate noncontingent liquidated secured and unsecured debt as of the Petition Date was below $7,500,000.00.  (The Debtor and the UST have stipulated that the $3,890,899.66 in debts listed in Amended Schedules D

---

[30]    Ex. 2 at 1-12.
[31]    *Id.* at 12.
[32]    Ex. 2 at 1-12.  The following Claims were listed as "contingent" or "unliquidated" on Amended Schedule D:   Claim Nos. 2.9 ($0.00), 2.10 ($196,075.00), 2.18 ($0.00), 2.20 ($57,285.00), 2.25 ($687,254.00), 2.26 (Unknown), and 2.28 (Unknown).
[33]    Ex. 2 at 13-21.
[34]    *Id.* at 22.
[35]    Ex. 2 at 13-21.  The following Claims were listed as "contingent" or "unliquidated":  Claim Nos. 2.3 ($491,856.00), 3.3 ($13,652.55), 3.4 ($13,213.56), 3.5 ($25,470.00), 3.7 (Unknown), 3.8 ($0.00), 3.10 ($418,085.36), 3.17 ($16,421.56), 3.18 ($0.00), 3.21 ($0.00), 3.23 ($207,003.99), 3.26 ($0.00), 3.27 ($297,697.74), 3.32 ($0.00), and 3.46 ($546,261.89).
[36]    Ex. 2 at 13-22; Stip. Fact No. 2.

and E/F and not asserted to be "contingent" or "unliquidated" should count against the Section 1182(1)(A) debt cap.)[37]

At trial, the Debtor did not present evidence justifying all the myriad changes asserted in Amended Schedules D and E/F.  The Debtor failed to show that the changes were mere corrections.  Based upon the Debtor's lack of evidence, the timing of the changes (which were made only after the Eligibility Objection), and the nature and amount of the 73 changes (all of which operated to reduce debt for Section 1182(1)(A) debt cap purposes), the Court finds that the Amended Schedules D and E/F are highly suspect and not entitled to evidentiary deference (especially given the unexplained contradictions with the Initial Schedules D and E/F).  At best, the differences between Initial Schedules D and E/F and Amended Schedules D and E/F show that the submissions were extremely haphazard and unreliable.  At worst, it appears that the Debtor may have engaged in bad faith.

**D.**    **Other Factual Findings.**

The Eligibility Objection and Response will require the Court to carefully review and analyze numerous claims listed by the Debtor in its Initial and Amended Schedules D and E/F as well as claims filed by creditors.  Given the voluminous nature of the evidence regarding such claims, the Court will make further factual findings when considering claims bearing on eligibility under the Legal Analysis heading.

**V.    Legal Analysis.**

**A.    Statutory Framework for Subchapter V Eligibility.**

The Court's eligibility analysis starts — as it must — with the text of the applicable statute.  Section 1182 defines the term "debtor" in Subchapter V cases:

> (1) Debtor.  The term "debtor" —
>
> (A) subject to subparagraph (B), means a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has *aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $7,500,000* (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor; and

---

[37]   *Id.*

7

(B) does not include —

(i) any member of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $7,500,000 (excluding debt owed to 1 or more affiliates or insiders);

(ii) any debtor that is a corporation subject to the reporting requirements under section 13 or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)); or

(iii) any debtor that is an affiliate of a corporation described in clause (ii).

11 U.S.C. § 1182 (emphasis added).

So, structurally, Section 1182(1)(A) identifies who generally qualifies as a Subchapter V debtor.  Then, Section 1182(1)(B) lists exceptions to the general rule.  The exclusions in Section 1182(1)(B) are not applicable in this dispute because the Debtor is not: a "member of a group of affiliated debtors"; a "corporation" subject to reporting requirements under 15 U.S.C. §§ 78m or 78o(d); or an "affiliate of a corporation [subject to the reporting requirement sunder section 13 or 15(d) of the Securities Exchange Act]."  Thus, in this case, the eligibility focus rests exclusively on Section 1182(1)(A).

The Section 1182(1)(A) statutory text lists four discrete requirements for Subchapter V eligibility.  Paraphrased, the mandatory elements are:

(1)     the Debtor must be a "person";

(3)     the Debtor must be "engaged in commercial or business activities"

(3)     the Debtor's aggregate debt as of the Petition Date must not exceed $7,500,000; and

(4)     50% or more of the Debtor's debt must have arisen from "the commercial or business activities of the [D]ebtor."  *Id*.

The Debtor bears the burden to prove his eligibility under Subchapter V.  *In re Ikalowych*, 629 B.R. 261, 275 (Bankr. D. Colo. 2021); *In re Sullivan*, 626 B.R. 326, 329-30 (Bankr. D. Colo. 2021).  *Cf. First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 705 (10th Cir. 2014) ("Debtors had the burden of establishing their eligibility for Chapter 12 relief."); *Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1384-85 (10th Cir. 1998) (debtor

bears burden to show eligibility under Chapter 9 of Bankruptcy Code).  The Court will consider each of the mandatory elements in turn.

**B.**     **The Debtor Meets the "Person" Requirement.**

The first Section 1182(1)(A) requirement is that the Debtor must be a "person." In Section 101(41), Congress defined the term "person" to include: "individual, partnership, and corporation . . . ."  Per Section 101(9), the term "corporation" includes an "association having a power or privilege that a private corporation, but not an individual or a partnership, possesses."  A limited liability company qualifies as a "corporation," which in turn satisfies the statutory definition of "person."  *In re Longview Aluminum, L.L.C*, 657 F.3d 507, 509 n.1 (7th Cir. 2011) ("the Bankruptcy Code's definition of a corporation [Section 101(9)(A)(iv)] includes unincorporated limited liability companies"); *Koshkalda v. Seiko Epson Corp. (In re Koshkalda)*, 2020 WL 2730782, at *6 (9th Cir. BAP May 26, 2020) (unpublished) ("we have interpreted § 101(9)(A)(iv) to include limited liability companies"); *In re NRS Prop., LLC*, 634 B.R. 395, 410-11 (Bankr. D. Colo. 2021) (same).  So, the Debtor is a "person" and thus meets the first requirement of Section 1182(1).  The UST does not suggest otherwise.

**C.**     **The Debtor Meets the Two "Engaged in Commercial or Business Activities" Requirements.**

Section 1182(1)(A) contains two separate but closely related elements, both utilizing the same phrase:  "commercial or business activities."  First, the Debtor must be a person "engaged in commercial or business activities."  Second, "not less than 50%" of the Debtor's "aggregate noncontingent liquidated secured and unsecured debts" must have arisen from "the commercial or business activities of the [D]ebtor."

Since these two discrete elements contain a common phrase, the Court has grouped the requirements together for legal scrutiny.  And, besides, both mandates are very closely linked in their operation.  The first element establishes a general requirement:  the Debtor be "engaged in commercial or business activities."  The second reins in the general requirement quite substantially:  half or more of the Debtor's aggregate debt must have arisen from those same "commercial or business activities." The requirements must be read in tandem.

The phrase "commercial or business activities" is unique from a federal statutory perspective.  The term does not appear in any current federal statute except for the Bankruptcy Code:  Sections 1182(1)(A) and 101(51D), both of which pertain to small business debtors.[38]  Since the phrase "commercial or business activities" is not expressly defined in the Bankruptcy Code, the Court must engage in a statutory interpretation exercise.

---

[38]     Section 707(b)(5)(C) contains a similar phrase in defining a "small business": "commercial or business activity."

When construing a statute, the Court employs a fair reading method that dictates the primacy of the statutory text. The inquiry must center on the "language of the statute itself." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). The starting place is the "ordinary" meaning of the text. *See Clark v. Rameker*, 573 U.S. 122, 127 (2014); *Hamilton v. Lanning*, 560 U.S. 505, 513 (2010). And, the Court's duty is "to give effect, if possible, to every clause and word of a statute." *U.S. v. Menasche*, 348 U.S. 528, 538-39 (1955) (quoting *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152 (1883)). *See also Lowe v. SEC.*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute.").

Fortunately, the Court need not start the statutory interpretation exercise from scratch in this case because the Court already has analyzed the Section 1182(1)(A) "commercial or business activities" requirement comprehensively in *Ikalowych*, 629 B.R. 261. For the reasons stated in *Ikalowych*, 629 B.R. 261 (which the Court endorses in full):

> The Court decides from review of the text, and applying ordinary or plain meaning, that the term "commercial or business activities" means any private sector actions related to buying, selling, financing, or using goods, property, or services, undertaken for the purpose of earning income (including by establishing, managing, or operating an incorporated or unincorporated entity to do so). "Commercial or business activities" may be contrasted with sovereign or governmental activities which a private-sector actor may not perform. Furthermore, consumer consumption transactions generally are not considered to be "commercial or business activities" (at least from the perspective of the consumer debtor) since such transactions are not undertaken to earn income. *See* [*In re Sullivan*, 626 B.R. 326, 329–34 (Bankr. D. Colo. 2021)] (suggesting that "consumer debt" is not "commercial or business" debt). So, in the end, "commercial or business activities" covers a lot.

*Id.* at 276. And, in assessing "commercial or business activities" under Subchapter V, the Court "must turn to the then-present state of things as of the Petition Date," including the relevant "circumstances immediately preceding and subsequent to the Petition Date as well as the Debtor's conduct . . . ." *Id.* at 283. *See also In re Johnson*, 2021 WL 825156, at *6 (Bankr. N.D. Tex. Mar. 1, 2021) ("the 'engaged in' inquiry is inherently contemporary in focus"); *In re Thurmon*, 625 B.R. 417, 422 (Bankr. W.D. Mo. 2020) (construing the SBRA and deciding that "[t]he plain meaning of "engaged in" means to be actively and currently involved").

Turning to the particulars in this bankruptcy proceeding, the Debtor is a "heating, cooling, plumbing, and electric sales, service, and repair company founded in 2019"

10

which "offers residential and commercial services in the Front Range Area, from Fort Collins to Colorado Springs."[39]  The Debtor earned "gross revenue" from "operating a business" in the following amounts: (1) $5,793,536.30 in 2023 through the Petition Date; (2) $12,137,052.01 in 2022; and (3) $8,681,240.00 in 2021.[40]  The Debtor has all the normal attributes of an operating commercial business including: business financial accounts; office furniture and fixtures; office equipment; a fleet of vehicles; inventory and equipment; leased offices; and many employees.[41]  The Debtor operated its business pre-bankruptcy and continues to operate it post-bankruptcy.  Under such circumstances, the Debtor easily satisfies the "engaged in commercial or business activities" test in Section 1182(1)(A).

The second "commercial or business activities" part of Section 1182(1)(A) is the requirement that "not less than 50%" of the Debtor's "aggregate noncontingent liquidated secured and unsecured debts" must have arisen from "the commercial or business activities of the [D]ebtor."  Irrespective of the *amount* of the Debtor's debt (a topic very much in dispute), it is readily apparent that *all* the Debtor's debt stems from "the commercial or business activities of the [D]ebtor."  Again, the Debtor is a "heating, cooling, plumbing, and electric sales, service, and repair company."  All of the Debtor's debts have been described by the Debtor on Initial and Amended Schedules D and E/F as either: "automobile loan," "auto lease," "secured lease," "business loan," "short term business loan," "business funding," "lease," "secured loan – automotive lifts," "revenue purchase agreement," "city taxes," "wage withholding taxes," "payroll taxes," "taxes," "trade debt," "business services," "business credit card," "insurance," "business insurance," "future receivables sale and purchase agreement," "advertising," "expected employee retention tax credit," "business advertising," attorney fees," "business," or "business pest control."[42]  There are no other categories of debt identified on Initial and Amended Schedules D and E/F.  Applying the definition of "commercial or business activities" from *Ikalowych*, 629 B.R. 261, the Court determines that all the Debtor's debt stems from "commercial or business activities."  (The Court's conclusion should not be a surprise because the Debtor is an operating entity, not an individual with personal debts.)  So, the Debtor satisfies the two "commercial or business activities requirements in Section 1182(1)(A).  The UST does not suggest otherwise.

**D.      The Debtor Fails the $7,500,000 Debt Cap Requirement.**

So, now the Court arrives at the heart of the eligibility dispute: the statutory debt cap.  To proceed in Subchapter V, the Debtor must have "aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition . . . in an amount not more than $7,500,000."  11 U.S.C. § 1182(1)(A).

---

[39]      Stip. Fact (Background and Procedural History) No. 7.
[40]      Ex. 1 at 65.
[41]      Ex. 1 *passim*.
[42]      Ex. 1 at 22-73; Ex. 2 at 1-22.

1.      **Applicable Legal Standards.**

The Section 1182(1)(A) debt cap for Subchapter V eligibility is modeled after the long-standing statutory debt cap for Chapter 13 debtors.  Like Section 1182(1)(A), Section 109(e) provides:

> Only an individual with regular income that owes, on the date
> of the filing of the petition, noncontingent, liquidated debts of
> less than $2,750,000[43] or an individual with regular income
> and such individual's spouse . . . that owe, on the date of the
> filing of the petition, noncontingent, liquidated debts that
> aggregate less than $2,750,000 may be a debtor under
> chapter 13 . . . .

11 U.S.C. § 109(e).  Both statutes utilize the words "noncontingent" "liquidated" and "debts" with reference to their respective monetary limitations.  Only "noncontingent, liquidated debts" count.  So, Chapter 13 precedent applies in Subchapter V cases.

Congress defined the term "debt" broadly to mean "liability on a claim." 11 U.S.C. § 101(12).  And, statutorily, "claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5).  But again, for purposes of Subchapter V and Chapter 13 eligibility, only debts that are contingent or unliquidated are excluded from the computation.

The important terms "noncontingent" and "liquidated" (which modify the word "debts") are not expressly defined in the Bankruptcy Code.  Nevertheless, they both have plain and settled meanings in bankruptcy law.  The seminal decisions in this jurisdiction construing the terms "noncontingent" and "liquidated" in the context of eligibility are: *In re Blehm*, 33 B.R. 678 (Bankr. D. Colo. 1983); *In re Clark*, 91 B.R. 570 (Bankr. D. Colo. 1988); *In re Reader*, 274 B.R. 893 (Bankr. D. Colo. 2002); and *In re Hanson*, 275 B.R. 593 (Bankr. D. Colo. 2002).

a.      **The Meaning of "Noncontingent" Debt.**

In the earliest Colorado decision after enactment of the Bankruptcy Code, *Blehm*, 33 B.R. 678, the court construed the meaning of "noncontingent" debt.  After noting that the "concepts [noncontingent and liquidated] have been around a long time [referring to the Bankruptcy Act]," the court held:

> Generally, the courts have considered as contingent debts
> those claims which depend either as to their existence or
> their amount on some future event which may not occur at
> all or may not occur until some uncertain time.

---

[43]      The debt cap in Section 109(e) has been raised multiple times since Chapter 13 was enacted and now is $2,750,000.00.

. . . .

The classic examples of contingent debts are the guarantor/surety situations and a tort claim on which no judgment has been entered.  The guarantor situation is obvious — there liability is dependent on a future uncertain event — the default of the primary obligor.  Tort claims have been considered contingent because they require proof by the plaintiff creditor of the debtor's liability and the amount of damages are, by their very nature, not fixed unless and until a judgment is entered setting the debtor's liability.

*Id*. at 679-80.  A few years later, in *Clark*, 91 B.R. 570, the court endorsed the *Blehm* formulation of contingent debt characterizing "[t]ort claims such as fraud, piercing the corporate veil, or quantum meruit, which were disputed and where proof as to liability and damages is *still* to be produced . . . ." as contingent.  *Id*. at 574 (emphasis in original).  The *Clark* court distinguished "[t]ort claims as contrasted to contract, promissory note or similar claims."  *Id.* at 572, n.5.

Later, in two back-to-back cases (*Reader*, 274 B.R. 893, and *Hanson*, 275 B.R. 593), the Colorado bankruptcy court reconfirmed the foregoing as follows:

A debt is noncontingent when all events giving rise to liability occurred prior to the debtor's filing for bankruptcy.  *In re Mazzeo,* 131 F.3d 295, 303 (2nd Cir. 1997).  "Only if liability relies on some future extrinsic event which may never occur will the debt be held to be contingent."  *In re Nesbit,* 2000 WL 294834, at *2 (Bankr. W.D. Pa. 2000).  "It is generally agreed that a debt is contingent if it does not become an obligation until the occurrence of a future event, but is noncontingent when all of the events giving rise to liability for the debt occurred prior to the debtor's filing for bankruptcy."  *In re Mazzeo,* 131 F.3d at 303. *See In re Knight*, 55 F.3d 231, 236 (7th Cir. 1995). *See also In re Blehm,* 33 B.R. 678, 680 (Bankr. D. Colo. 1983); *In re All Media Properties, Inc.,* 5 B.R. 126 (Bankr. S.D. Tex. 1980), aff'd, 646 F.2d 193 (5th Cir. 1981); 2 L. King, COLLIER ON BANKRUPTCY ¶ 109.06[2][b] (15th ed. rev. 2001) ("In deciding whether a claim is noncontingent, and therefore counted toward the debt limits, courts have generally ruled that if a debt does not come into existence until the occurrence of a future event, the debt is contingent . . . .  [A] creditor's claim is not contingent when the 'triggering event' occurred prior to the filing of the chapter 13 petition.")

13

*Hanson*, 275 B.R. at 596 (ellipsis in original).  *See also In re Krupka*, 317 B.R. 432, 436 (Bankr. D. Colo. 2004) (same, citing *Mazzeo*, 131 F.3d at 303 and other cases); *Reader*, 274 B.R. at 896 (same).  Both the Debtor and the UST agree to the foregoing definitions of "noncontingent."[44]

> ### b.      The Meaning of "Liquidated" Debt.

"Liquidation has to do with whether the *amount* of the claim can be easily determined.  Again, generally speaking, claims are liquidated if the Court is able to make a sufficiently precise determination of the amount due for the claim."  *Blehm*, 33 B.R. at 679 (emphasis in original).  Put another similar way in *Clark*, 91 B.R. 570, "a debt is deemed liquidated if '. . . the amount due is capable of ascertainment *by reference to an agreement* or by a single computation.'"  *Id.* at 574 (quoting *In re Potenza*, 75 B.R. 17, 18 (Bankr. D. Nev. 1987)) (emphasis added, ellipsis in original).  Reinforcing the foregoing, in *Hanson* and *Reader*, the Colorado bankruptcy court held:

> Whether a debt is liquidated turns on whether it is subject to "ready determination and precision in computation of the amount due."  *In re Sylvester,* 19 B.R. 671, 673 (9th Cir. BAP 1982), quoting *In re Bay Point Corp.,* 1 B.C.D. 1635 (Bankr. D. N.J. 1975); *In re Fostvedt,* 823 F.2d 305, 306 (9th Cir. 1987).  In other words, a debt is considered to be "liquidated" if the amount is readily ascertainable. *See In re Burgat,* 68 B.R. 408 (Bankr. D. Colo. 1986).

*Hanson*, 275 B.R. at 596; *see also NCI Bldg. Sys. LP v. Harkness (In re Harkness)*, 189 Fed. Appx. 311, at *2 (5th Cir. 2006) (unpublished) ("courts generally agree that a debt is liquidated if the amount of the claim is readily ascertainable, whether it is contested or not"); *Slack v. Wilshire Ins. Co.*, 187 F.3d 1070, 1073 (9th Cir. 1999) ("This circuit has held that a debt is liquidated for the purposes of calculating eligibility for relief under § 109(e) if the amount of the debt is readily determinable."); *Krupka*, 317 B.R. at 436 ("A debt is liquidated, regardless of whether or not the Debtor disputes the debt, if the amount of the debt is capable of being readily ascertained.") (citations omitted); *Reader*, 274 B.R. at 896 (same).  Both the Debtor and the UST agree to the foregoing definitions of "liquidated."[45]

> ### c.      A Dispute Over the Debt Does Not Render the Debt Contingent or Unliquidated.

Importantly, just because a debt is "disputed" does not make it "contingent" or "unliquidated."  *Blehm*, 33 B.R. at 680.  *See also Slack*,187 F.3d at 1074 ("We are persuaded that under this circuit's 'readily determinable' standard, if the amount of the creditor's claim at the time of the filing the petition is ascertainable with certainty, a dispute regarding liability will not necessarily render a debt unliquidated."); *Mazzeo*, 131

---

[44]     Docket Nos. 117 at 7, 172 at 8, 229 at 7-8, and 230 at 12.
[45]     Docket Nos. 113 at 9, 172 at 8, 229 at 12-13, and 230 at 13.

F.3d at 303 ("We cannot view a debt as contingent merely because the debtor disputes the claim . . . ."); *Hanson*, 275 B.R. at 596 ("The majority of courts considering the question have held that merely because a debtor disputes a debt, or has potential defenses or counterclaims that might reduce the creditors' actual collection, the debt is not thereby rendered 'contingent' or 'unliquidated.'") (quoting *In re Crescenzi*, 69 B.R. 64, 65 (S.D.N.Y.1986)); *Reader*, 274 B.R. at 896-97 (same); *Clark* 91 B.R. at 574 ("a debtor's dispute, defenses or counterclaims, do not affect the character and classification of a claim as being *liquidated"*) (emphasis in original).

### d.   Debt Cap Calculations for Eligibility Purposes Should Be Based on Schedules, Proofs of Claim, and Other Evidence.

To determine eligibility (based on a debt cap calculation) as of the Petition Date, the Court generally must "look at the debtor's schedules and the timely-filed proofs of claim." *In re Lower*, 311 B.R. 888, 891 (Bankr. D. Colo. 2004). The Debtor appears to prefer that the Court ignore the Initial Schedules D and E/F and instead rely on the Amended Schedules D and E/F filed after the Eligibility Objection (which are much more favorable for the Debtor for eligibility purposes) while not considering the proofs of claim and other evidence.

However, the Debtor's Amended Schedules D and E/F are not dispositive. As the United States Court of Appeals for the Tenth Circuit determined in the context of the Chapter 13 debt cap:

> . . . it was proper for the bankruptcy court to look past the characterization of [the debtor's] claims in his schedules and consider other evidence. *See, e.g., Quintana v. Internal Revenue Service (In re Quintana),* 107 B.R. 234, 238 n.6 (9th Cir. BAP 1989) ("If the debtors' schedules were dispositive, then eligibility could be created by improper or incomplete scheduling of creditors. A bankruptcy court should look past the schedules to other evidence submitted when a good faith objection to the debtor's eligibility has been brought by a party in interest.)."

*Murphy v. McArthur (In re Murphy)*, 146 Fed. Appx. 285, at *4 (10th Cir. 2005 (unpublished). The Eligibility Objection is a good faith objection to the Debtor's eligibility brought by the UST.

Accordingly, the Court "does not adopt the view that the Debtors' schedules alone control the eligibility determination. The requirement that a debt must be liquidated to apply towards the eligibility requirements suggests that the Court may not rely solely upon the Debtors['s] schedules." *In re Salazar*, 348 B.R. 559, 565 (Bankr. D. Colo. 2006). *See also Barcal v. Laughlin (In re Barcal)*, 213 B.R. 1008, 1015 (8th Cir. BAP 1997) (holding that a "court should neither place total reliance upon a debtor's characterization of a debt nor rely unquestionably on a creditor's proof of claim, for to do

15

so would place eligibility in control of either the debtor or the creditor and instructing that a "court should thus, canvass and review the debtor's schedules and proofs of claim, as well as other evidence . . . .") (citations omitted). And, the foregoing principles are especially so in this dispute because the Court assesses that the Debtor manipulated (and lowered) debt in Amended Schedules D and E/F to bolster its prospects for Section 1182(1)(A) eligibility only after the UST filed the Eligibility Objection. *In re Arcella-Coffman,* 318 B.R. 463, 476 (Bankr. N.D. Ind. 2004) ("This Court also approaches amendments to schedules circumspectually and circumstantially, and the element of qualitative proof provided by schedules — which the Court alone must weigh and determine — will be affected by the nature of amendments in the context of the issues in a contested matter, and the timing of the amendments in the context of issues to which the amendments apparently are intended to respond.); *In re Spurlin*, 350 B.R. 716, 721 (Bankr. W.D. La. 2006) ("close scrutiny of [an] amendment is warranted" where change made in response to motion).

> **2.** **The Debtor and the UST Agree that the Debtor Has At Least $3,890,899.66 in Noncontingent and Liquidated Debt.**

The Debtor and the UST agree that the Court should count $3,890,899.66 in debt listed in Amended Schedules D and E/F for which the Debtor did not check the boxes for "contingent" or "unliquidated" against the statutory debt cap. To be clear, the Court identifies such uncontested amounts as follows:

| Amended Schedule D | Claim No. | Creditor | Amount |
|---|---|---|---|
| | 2.1 | Ally Financial | $32,302.18 |
| | 2.2 | Ally Financial | $13,792.06 |
| | 2.3 | Ally Financial | $30,693.00 |
| | 2.4 | Ally Financial | $21,041.35 |
| | 2.5 | Chrysler Capital | $35,916.95 |
| | 2.6 | Chrysler Capital | $36,781.45 |
| | 2.7 | Chrysler Capital | $33,200.08 |
| | 2.8 | Chrysler Capital | $35,852.30 |
| | 2.11 | Ford Motor Credit | $38,325.00 |
| | 2.12 | Ford Motor Credit | $45,975.00 |
| | 2.13 | Ford Motor Credit | $45,975.00 |
| | 2.14 | Ford Motor Credit | $43,175.00 |
| | 2.15 | Ford Motor Credit | $43,175.00 |
| | 2.16 | Ford Motor Credit | $43,175.00 |
| | 2.17 | Ford Motor Credit | $47,553.85 |
| | 2.19 | Libertas Funding, LLC | $1,034,120.27 |
| | 2.21 | Mitsubishi HC | $55,814.26 |
| | 2.22 | Mitsubishi HC | $29,841.77 |
| | 2.23 | Mitsubishi HC | $29,841.77 |
| | 2.24 | Mitsubishi HC | $52,637.00 |
| | 2.27 | US Bank Auto Loan | $20,879.65 |

| | | | |
|---|---|---|---|
| Amended Schedule E/F | 2.1 | City of Sheridan | Unknown |
| | 2.2 | Colo. Dept. of Revenue | $267,529.37 |
| | 2.4 | Internal Revenue Service | $0.00 |
| | 3.1 | Abbots Cleanup & Rest. | $23,567.97 |
| | 3.2 | Ally Financial | $7,677.16 |
| | 3.6 | Audacy Operations | $21,250.00 |
| | 3.9 | Capital One Spark | $36,814.91 |
| | 3.11 | Chase Ink | $121,561.41 |
| | 3.12 | Chinook Properties LLC | Unknown |
| | 3.13 | CitFinancial | $43,308.76 |
| | 3.14 | Continental Western Group | $96,000.00 |
| | 3.15 | Cost Plus Electric | $15,044.84 |
| | 3.16 | Elavon | $13,190.26 |
| | 3.19 | Gregory Realty | $9,685.56 |
| | 3.20 | Headway Capital, LLC | $92,350.37 |
| | 3.22 | Home Depot Pro | $28,194.34 |
| | 3.24 | Integrity Excavations | $17,150.00 |
| | 3.25 | Johnstone Supply | $237,653.30 |
| | 3.28 | Lennox Industries, Inc. | $50,220.96 |
| | 3.29 | M&N Plumbing Supply Co. | $107,979.96 |
| | 3.30 | Michael M. Massa | $55,040.62 |
| | 3.31 | Mike Albert Leasing, Inc. | $72,571.73 |
| | 3.33 | Nat'l Health Ins. | $102,175.90 |
| | 3.34 | Nationwide Inbound, Inc. | $8,641.83 |
| | 3.35 | NewTek Imaging | $12,548.00 |
| | 3.36 | Orkin | $3,855.00 |
| | 3.37 | Rocky Mountain Hospital | $330,175.55 |
| | 3.38 | Runge Tool | $28,556.99 |
| | 3.39 | Sabell Snow Plowing | $8,012.27 |
| | 3.40 | Sec. Nat'l Ins. Co. | $25,470.00 |
| | 3.41 | Service Uniform, Inc. | $221,452.66 |
| | 3.42 | Sunbelt Rentals | $1,879.71 |
| | 3.43 | TGI Inc. | $1,080.00 |
| | 3.44 | Thryv | $9,885.83 |
| | 3.45 | To Your Success | $1,540.60 |
| | 3.47 | US Bank | $48,765.86 |
| | | | |
| | | Total | $3,890,899.66[46] |

While the parties have agreed to accept such uncontested amounts toward the Section 1182(1)(A) debt cap, the Court finds that the Debtor reduced many such

---

[46] Ex. 2 at 1-21; Stip. Fact No. 2.

amounts from Initial Schedules D and E/F to Amended Schedules D and E/F in a blatant effort to manipulate (and lower) debt for eligibility purposes.  For example:

- The Debtor reduced Amended Schedule D Claim No. 2.2 from $30,096.40 (on Initial Schedule D) to $13,792.06.  Creditor Ally Bank filed Proof of Claim No. 7-1 for $30,509.30.

- The Debtor reduced Amended Schedule D Claim No. 2.11 from $62,969.96 (on Initial Schedule D) to $38,325.00.  Creditor Ford Motor Credit filed Proof of Claim No. 25-1 for $60,363.05.

- The Debtor reduced Amended Schedule D Claim No. 2.12 from $67,277.42 (on Initial Schedule D) to $45,975.00.  Creditor Ford Motor Credit filed Proof of Claim No. 28-1 for $65,493.42.

- The Debtor reduced Amended Schedule D Claim No. 2.13 from $74,652.02 (on Initial Schedule D) to $45,975.00.  Creditor Ford Motor Credit filed Proof of Claim No. 27-1 for $72,06.90.

- The Debtor reduced Amended Schedule D Claim No. 2.14 from $72,446.99 (on Initial Schedule D) to $43,175.00.  Creditor Ford Motor Credit filed Proof of Claim No. 23-1 for $70,337.75.

- The Debtor reduced Amended Schedule D Claim No. 2.15 from $72,814.33 (on Initial Schedule D) to $43,175.00.  Creditor Ford Motor Credit filed Proof of Claim No. 26-1 for $69,810.94.

- The Debtor reduced Amended Schedule D Claim No. 2.16 from $72,502.43 (on Initial Schedule D) to $43,175.00.  Creditor Ford Motor Credit filed Proof of Claim No. 24-1 for $70,517.23.

- The Debtor reduced Amended Schedule D Claim No. 2.17 from $65,527.05 (on Initial Schedule D) to $47,553.85.  Creditor Ford Motor Credit filed Proof of Claim No. 29-1 for $63,201.20.

- The Debtor reduced Amended Schedule E/F Claim No. 3.13 from $158,346.86 (on Initial Schedule D as Claim No. 2.8 ) to $43,308.76.

There are many more examples.[47]  During the trial, the Debtor offered virtually no evidence why the Debtor made all the various reductions of these "uncontested amounts" for Amended Schedules D and E/F (which total hundreds of thousands of

---

[47]    Some of the claims listed on the Amended Schedule E/F also are materially lower than filed proofs of claim.  For example, Mitsubishi HC Capital America, Inc. filed Proof of Claim No. 30-1 for $212,377.43, which amount is supported by contracts and schedules.  Yet, on Amended Schedule E/F, the Debtor asserts that it owes such creditor only $168,134.80.  Which is right?  The Debtor failed to explain the discrepancy, thereby suggesting another material understatement of debt.

dollars) or why all the changes went only in one direction — to reduce debt.  The Debtor presented no evidence that the changes were corrections.  Instead, the Debtor's Chief Executive Officer, Robert M. Townsend, swore under oath that both the Initial Schedules D and E/F and Amended Schedules D and E/F were correct and had no explanation for the changes.  The various creditors' proofs of claim are in accord with the higher amounts in the Initial Schedule D, not the reduced amounts in Amended Schedule D.  The Debtor's failure of proof leads the Court to find that the Debtor engaged in a wholesale effort to manipulate the Amended Schedules D and E/F to reduce debt and thereby make eligibility more likely.  *See Arcella-Coffman,* 318 B.R. at 476 ("Amendments made on the eve of trial, or close in time after the initiation of a matter or proceeding in which the debtor would be disadvantaged by the schedules in their pre-amendment form — raise very concrete evidentiary issues as to the qualitative worth — "weight" if you will — to be given to the amendments.").

But in the end, there are so many other problems with what the Debtor has done to repaint its debt picture that is not necessary to delve deeper into the "uncontested amounts."  Instead, as the Debtor and the UST have requested, the Court will simply accept that the foregoing $3,890,899.66 in debt listed in Amended Schedules D and E/F, for which the Debtor did not check the boxes for "contingent" or "unliquidated", will count against the statutory debt cap (the "Uncontested Debt").

### 3.   <u>The IRS Debt Must Be Counted Toward the Statutory Debt Cap</u>.

On its Initial Schedule D, the Debtor listed a debt owed to the Internal Revenue Services (the "IRS") in the amount of $792,811.00.[48]  The Debtor did not assert that such debt was contingent or unliquidated.  After the UST submitted the Eligibility Objection, the Debtor presented an Amended Schedule E/F obviously designed to improve the Debtor's eligibility argument by taking the IRS debt out of the statutory debt cap calculation.  On Amended Schedule E/F, the Debtor: (1) reduced the amount of the IRS debt from $792,811.00 to $491,856.00; and (2) asserted that the IRS debt was both contingent and unliquidated (and disputed).[49]  The reduction apparently was based upon the IRS' Proof of Claim No. 31-2, dated August 29, 2023, wherein the IRS asserted a debt or $491,856.68.  However, IRS Proof of Claim No. 31-2 noted that the Debtor had not submitted its 2022 federal income tax return and so included only a $100.00 estimate for tax year 2022 and no amount for "WT-FICA 12/31/2022." Subsequently, the Debtor submitted its 2022 filings resulting in the IRS's asserting IRS Proof of Claim No. 31-3 in the aggregate amount of $1,022,547.50.[50]  However, IRS Proof of Claim No. 31-3 includes $46,953.64 in taxes owed after the Petition Date.[51] So, with respect to debt before the Petition Date, the IRS asserts it is owed $975,593.86.

---

[48]     Ex. 1 at 53.
[49]     Ex. 2 at 14.
[50]     Ex. 23.  IRS Proof of Claim No. 31-3 also contains some estimates for periods in 2023 because the Debtor was not current since "the return was not filed" by the Debtor.
[51]     *Id.*

The Debtor failed to offer any evidence of the correct amount of the debt it owes the IRS other than the Initial Schedule E/F and Amended Schedule E/F which were both submitted under oath and which directly contradict each other.  Furthermore, such Schedules were filed before the Debtor submitted its delinquent 2022 federal income tax return.  (The Debtor's late submission of a federal income tax return for 2022 cannot be used to reduce the amount of tax debt owed as of the Petition Date.)  IRS Proof of Claim No. 31-3 is prima facia evidence of the validity and amount of the IRS debt.  *See* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."); *In re Knize*, 210 B.R. 773, 778 (Bankr. N.D. Ill. 1997) ("Thus, the IRS's amended claim is prima facie evidence of the validity and amount of the claim.").  Accordingly, without any evidence to the contrary, the Court accepts IRS Proof of Claim No. 31-3 which establishes $975,593.86 as the amount of debt owed by the Debtor to the IRS as of the Petition Date.[52]

As noted above, the Debtor suggests that such IRS debt is contingent and unliquidated.  Why?  The Court does not know.  The Debtor did not present any evidence proving that the $975,593.86 in pre-Petition Date debt owed to the IRS is contingent or unliquidated.  And, the Debtor presented no legal basis (in the Response, legal brief, or during closing argument) for its newfound position either.

The Court determines that the debt owed to the IRS is noncontingent.  As noted previously, "[a] debt is noncontingent when all events giving rise to liability occurred prior to the debtor's filing for bankruptcy."  *Hanson*, 275 B.R. at 596.  By definition, the debt owed to the IRS as of the Petition Date is calculated based upon the Debtor's pre-Petition Date financial results, including income and expenses.  There is nothing contingent about it, because the events giving rise to the tax obligation occurred prior to the Petition Date.  *U.S. v. Verdunn,* 89 F.3d 799, 803 (11th Cir. 1996) (for purposes of eligibility under Chapter 13 statutory debt cap, "federal income tax liabilities and penalties were noncontingent, liquidated, unsecured debts" on the petition date); *In re Hair*, 2012 WL 5939352, at *1 (Bankr. E.D.N.C. Nov. 27, 2012) ("All the activities giving rise to the tax liabilities [for pre-petition periods] . . . have already occurred; therefore, the IRS's claims are not contingent [even though estimated].").

The debt owed to the IRS also is liquidated.  As explained above, "a debt is considered to be 'liquidated' if the amount is readily ascertainable."  *Hanson*, 275 B.R. at 596.  Tax obligations are readily ascertainable by applying federal tax law (including the Internal Revenue Code, 26 U.S.C. § 1 *et seq.*) based upon the Debtor's financial results, including income and expenses.  *Verdunn,* 89 F.3d at 803 (tax debt was liquidated under Chapter 13 statutory debt cap because it "was easily ascertainable, *i.e.,* it was computed through application of fixed legal standards set forth in the tax code"); *Knize*, 210 B.R. at 779 ("When a debt to the IRS can be ascertained or readily calculated, it is liquidated for purposes of § 109(e)."); *Hair*, 2012 WL 5939352, at *1 (tax debt was noncontingent because "the tax code, established IRS policies, and the proof of claim were used to determine the debtor's estimated tax liability").

---

[52]   *Id.*

Accordingly, the $975,593.86 owed by the Debtor to the IRS as of the Petition Date (and as evidenced by IRS Proof of Claim No. 31-3) must be included in the Section 1182(1)(A) debt cap.

**4.      The Merchant Cash Advance Debt Must Be Counted Toward the Statutory Debt Cap.**

Prior to the Petition Date, the Debtor received what the Debtor and the UST agree should be characterized as "loans"[53] from a series of eight "merchant cash advance creditors."[54]   Adopting the nomenclature used by the Debtor and the UST, the "Merchant Cash Advance Creditors" are: (1) Westwood Funding Solutions, LLC[55]; (2) NewCo Capital Group VI LLC[56]; (3) Cloudfund, LLC; (4) Fox Capital Group, Inc.[57]; (5) EBF Holdings, LLC[58]; (6) MYNT Advance; (7) Ultra Funding, LLC; and (8) Canon Advance, LLC.[59]  The following chart lists each of the Merchant Cash Advance Creditors and associated debt as stated on: (1) the Debtor's Balance Sheet attached to its initial Monthly Operating Report for July 2023 (the "Initial MOR")[60]; (2) the Initial Schedules D and E/F; (3) the Amended Schedules D and E/F; and (4) in various Proofs of Claim.[61]

| MCA Creditor | Liability Per Initial MOR | Claim Per Initial Schedules D and E/F | Claim Per Amended Schedules D and E/F | Claim Per Proofs of Claim |
|---|---|---|---|---|
| | | | | |
| Westwood Funding Solutions, LLC | $830,267.59 | $830,493.09 | Unknown | N/A |
| NewCo Capital | $518,559.10 | $518,700.00 | $687,254.00 | $687,254.00 |

---

[53]      Stip. Fact Nos. 8, 9, 10, 13, 17, 20, 24, 27, 30, 31, 32, 33, and 36.

[54]      Stip. Fact No. 6 (identifying "merchant cash advance creditors").  Amended Schedule E/F also lists another Merchant Cash Advance Creditor:  BMT Capital Group Inc. (Claim No. 3.7).  Ex. 2 at 3.  The Debtor identified the "basis for the claim" as "Future Receivables Sale and Purchase Agreement" and then listed the amount of the claim as "unknown."  This is all very strange.  If the Debtor entered into a contract with BMT Capital Group Inc., then the Debtor should know the amount owed.  The Debtor's failure to provide any evidence on the issue demonstrates again that the Debtor has engaged in obvious manipulation of its Amended Schedules D and E/F to promote Subchapter V eligibility.  But, in the end, it matters not because the Debtor plainly exceeds the Section 1182(1)(A) debt cap.

[55]      The Debtor sometimes has referred to this entity as "Westwood Funding Solutions."

[56]      The Debtor sometimes has referred to this entity as "Newco Capital Group."

[57]      The Debtor sometimes has referred to this entity as "Fox Business Funding."

[58]      The Debtor sometimes has referred to this entity as "Everest Business Funding."

[59]      *Id.*

[60]      Docket No. 86 at 15.

[61]      Exs. 1, 2, 8, 13, 15, 17, and 19; Stip. Fact Nos. 6 and 7 (as corrected).  Not all the Merchant Cash Advance Creditors filed proofs of claim.

| Group VI LLC | | | | |
|---|---|---|---|---|
| Cloudfund, LLC | $447,778.50 | $447,900.00 | $0.00 | N/A |
| Fox Capital Group, Inc. | $128,043.64 | $128,078.54 | $0.00 | $130,064.26 |
| EBF Holdings, LLC | $196,021.70 | $196,075.00 | $196,075.00 | $187,125.00 |
| MYNT Advance | $189,821.90 | $189,873.40 | $0.00 | $177,725.95 |
| Ultra Funding, LLC | $336,678.48 | $334,769.98 | $546,261.89 | $546,261.89 |
| Canon Advance, LLC | N/A | $100,000.00 | $0.00 | N/A |
| | | | | |
| Total: | $2,647,170.90 | $2,745.890.01 | $1,429,590.89 | $1,728,431.10 |

As best the Court understands, the Debtor contends that none of the foregoing debt (wherever listed) associated with the Merchant Cash Advance Creditors should count toward the Section 1182(1)(A) debt cap because either: (1) the debts are not debts because nothing is owed by the Debtor; (2) debts for which no proofs of claim were filed are not debts; (3) the debts are contingent; or (4) the debts are unliquidated (or some combination of the foregoing). Many of the Debtor's legal arguments are common to all of Merchant Cash Advance Creditors. However, because the facts and some of the characteristics of the debts owed to each of the Merchant Cash Advance Creditors are different, the Court is forced to canvas the claims associated with the Merchant Cash Advance Creditors separately.

### a. The Westwood Funding Solutions, LLC Debt Must Be Counted Toward the Statutory Debt Cap.

#### (1) The Westwood Funding Solutions, LLC Stipulations.

With respect to Merchant Cash Advance Creditor Westwood Funding Solutions, LLC ("Westwood), the Debtor and the UST stipulated as follows:

8. The Debtor entered into a merchant cash advance agreement with [Westwood] on March 30, 2022 (the "Westwood MCA No. 1"). *See* Exhibit 3, pp. 33-49. Pursuant to the Westwood MCA No. 1, Westwood loaned the Debtor $850,000. In exchange, the Debtor agreed to repay $1,190,000 by authorizing Westwood to make daily ACH withdrawals from the Debtor's designated bank account

of $5,804.88 or 16% of the Debtor's future receipts. *Id.* at p. 33.

9.      The Debtor entered into a second merchant cash advance agreement with Westwood on May 12, 2022 (the "Westwood MCA No. 2"). *See* Exhibit 3, pp. 16-32. Pursuant to the Westwood MCA No. 2, Westwood loaned the Debtor $275,000. In exchange, the Debtor agreed to repay $393,250 by authorizing Westwood to make daily ACH withdrawals from the Debtor's designated bank account of $2,808.93 or 10% of the Debtor's future receipts. *Id.* at p. 16.

10.      The Debtor entered into a merchant cash advance agreement with Westwood on June 14, 2022 (the "Westwood MCA No. 3") (Westwood MCA No. 1, Westwood MCA No. 2, and Westwood MCA No. 3 referred to collectively as the "Westwood Agreements"). *See* Exhibit 3, pp. 1-15. Pursuant to the Westwood MCA No. 3, Westwood loaned the Debtor $200,000. In exchange, the Debtor agreed to repay $288,000 by authorizing Westwood to make daily ACH withdrawals from the Debtor's designated bank account of $2,618.19 or 7% of the Debtor's future receipts. *Id.* at p. 1.

11.      Westwood's last successful ACH withdrawal under the Westwood Agreements was on or about November 22, 2022.

12.      Pre-petition, Westwood asserted the Debtor defaulted on the Westwood Agreements and purported to accelerate all amounts allegedly due under the Westwood Agreements. *See* Exhibits 4 and 5.[62]

Importantly, the Debtor and the UST also agreed that:

Although each of the merchant cash advance agreements discussed herein characterize their agreements as a "purchase of future receipts," the parties are characterizing these agreements as "loans" with respect to the Eligibility Objection.[63]

---

[62]      Stip. Fact Nos. 8-12 (bolding and underlining removed).
[63]      Stip. Facts at 4 n.7.

**(2)**     **The Westwood Agreements.**

As set forth above, the Debtor signed three contracts with Westwood: Westwood MCA No. 1, Westwood MCA No. 2, and Westwood MCA No. 3.[64]  Except for the dates and amounts, the Westwood Agreements are identical and based on the same form.  So, for ease of reference, the Court focuses on the text of Westwood MCA No. 1.

Westwood MCA No. 1 consists of a "Purchase Agreement," a "Secured Merchant Agreement" (with "Terms and Conditions"), a "Security Agreement," and a "Guaranty of Performance."  The parties also agreed to an "Appendix A: the Fee Structure," "ACH Authorization Forms," and "Addendums."[65]  To summarize and simplify, the Westwood MCA No. 1 provided that Westwood would buy 16% of the Debtor's "Future Receipts" for $850,000.00.  Then, Westwood would collect $5,804.88 per day of the "Future Receipts" from the Debtor (through a dedicated account) until Westwood recovered $1,190,000.00.  So, Westwood provided $850,000.00 to the Debtor while the Debtor was obligated to repay $1,190,000.00 over time.[66]  *See CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 805 (Bankr. D. Mont. 2021) ("The economic core of these [merchant cash advance] transactions was that CapCall provided the [debtor] entities with immediate cash (and hence liquidity to operate) upon closing.  In exchange, CapCall received a portion of future receivables generated through the restaurant operations.  The amounts promised to CapCall substantially exceeded the amount of cash CapCall paid, which created possible profit for CapCall and represented the cost to the [debtor] entities of obtaining financing in this fashion.").

Delving into the text, the "Purchase Agreement" part of the Westwood MCA No. 1 states:

> **Sale of Future Receipts.**  *Seller [Debtor] agrees to sell to Buyer [Westwood]*, in consideration of the Purchase Price [$850,000.00[67]] . . . *the Amount Sold [$1,190,000.00[68]], by delivering the Purchased Percentage [16%[69]] of the proceeds of each future sale made by Seller* ("Future Receipts"), including amounts due from Seller's credit card processor (hereafter "Processor").  "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card . . . or other form of

---

[64]     Ex. 3

[65]     Ex. 3 at 32-49.

[66]     The "Early Payoff Addendum" provided discounts if the Debtor repaid within one to four months. Ex. 3 at 49.

[67]     The term "Purchase Price" is defined as "$850,000.00."  Ex. 3 at 34.

[68]     The term "Amount Sold" is not expressly defined but apparently refers to the "Total Dollar Cost of Financing (The dollar value of the Future Receipts being sold.)" which means "$1,190,000.00."  Ex. 3 at 33.  *See also* Ex. 3 at 34 (defining the "Receipts Purchased Amount" as "$1,190,000.00").

[69]     The term "Purchased Percentage (The percentage of Future Receipts Seller agrees to remit to Buyer on a daily basis.)" is defined as "16%."  Ex. 3 at 33.  *See also* Ex. 3 at 34 (defining "Specified Percentage" as "16%").

monetary payment in the ordinary course of Seller's business.  As payment for the Amount Sold, Buyer will deliver to Seller the Purchase Price . . . .

**Collection of Future Receipts; Collection Authorization.**
*Buyer [Westwood] will be entitled to collect on a daily basis the cash attributable to the "Daily Amount of Future Receipts [$5,804.88[70]] . . . .  Buyer agrees to accept remittance of the Daily Amount in one of the following methods: (a) directly from the Processor, (b) by debiting the Seller's bank account, or (c) by debiting a deposit account established by the Seller . . . .[71]*

The "Secured Merchant Agreement" part of the Westwood MCA No. 1 is far more detailed and provides in relevant part:

*Merchant [Debtor] hereby sells and transfers to WF [Westwood] . . . in consideration of the Purchase Price [$850,000.00] . . . the Purchased Percentage [16%] of all of Merchant's future accounts*, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' . . . (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods and/or services . . . *until the "Purchased Amount [$1,190,000.00] has been delivered by or on behalf of Merchant to WF.*

Merchant is selling a portion of a future revenue stream to WF at a discount, not borrowing money from WF, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by WF.  The Remittance [$5,804.88] is a good faith estimate of (a) Purchased Percentage [16%] multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month.  Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement.  WF is entering this

---

[70]      The term "Daily Amount of Future Receipts" is not expressly defined but apparently refers to the "Payment Amount (The dollar amount to be collected from Seller's Bank Account each business day that represents the average monthly sales x Purchased Percentage / average business days in calendar month.)" which means "$5,804.88."

[71]      Ex. 3 at 33 ¶ 1-2 (italics added).

Agreement knowing the risks that Merchant's business may slow down or fail, and WF assumes these risks based upon Merchant's representations, warranties and covenants in this Agreement, which are designed to give WF a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount . . . .

*WF will debit the Remittance each business day from only one depositing bank account* . . . (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, *until such time as WF receives payment in full of the Purchased Amount.* Merchant hereby authorizes WF to ACH debit the Agreed Remittance from the Account on the agreed upon Payment Frequency . . . . *Merchant understands that it is responsible for ensuring that the Agreed Remittance to be debited by WF remains in the Account* . . . .

. . . .

*This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by WF as per the terms of this Agreement.*

Ex. 3 at 34-35 Preamble and ¶ 1.2 (emphasis added).

With respect to protections against default, the "Secured Merchant Agreement" part of the Westwood MCA No. 1 also allowed Westwood various remedies in the event that the Debtor changed its financial accounts or otherwise interfered in Westwood's ability to recover the $5,804.88 required daily remittance (by ACH or otherwise) from the Debtor's account. The remedies included: "*The full uncollected Purchased Amount [$1,190,000.00] plus all fees (including reasonable attorney's fees) due under this Agreement . . . become due and payable in full immediately.*"; and "*The entire Purchased Amount [$1,190,000.00] and all fee[s] (including reasonable attorney's fees) shall become immediately payable to WF from Merchant.*"[72]  The "Secured Merchant Agreement" part of the Westwood MCA No. 1 also defined the following as "Events of Default": "Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing . . . .";  "Merchant shall use multiple depository accounts without the prior written consent of WF";  "Merchant shall change its depositing account without the prior written consent of

---

[72]      Ex. 3 at 36 ¶ 1.12 (emphasis added).

WF"; and "Merchant shall close its depositing account used for ACH debits without the prior written consent of WF."[73]

The "Secured Merchant Agreement" part of the Westwood MCA No. 1 purports to be a "sale" of Future Receivables, not a loan.  It states:

> Merchant and WF agree that the Purchase Price [$850,000.00] under this Agreement is in exchange for the Purchased Amount [$1,190,000.00], and that such Purchase Price is not intended to be, nor shall it be construed as a loan from WF to Merchant.  Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts.  WF has purchased and shall own all the Receipts . . . .  Merchant knowingly and willfully waives the defense of Usury in any action or proceeding.[74]

However, somewhat contradictorily, the Westwood MCA No. 1 includes a "Security Agreement" pursuant to which the Debtor granted Westwood a security interest in the Debtor's Receivables.[75]

### (3)   The Westwood Debt is a Debt.

During closing argument (but not in the Response), the Debtor seemed to contend that it does not owe anything to Westwood — so there is no debt.  It is a very odd and unsupported position (both factually and legally).

The Westwood Agreements are a type of financing increasingly used by businesses in dire financial straits when traditional bank lending is unavailable.  The Debtor and the UST have labeled the Westwood Agreements as "Merchant Cash Advance" ("MCA") contracts.  The proper legal characterization of MCA contracts or similar factoring arrangements can be very challenging: they might be considered true sales or secured loans.  *Compare Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 539 and 546 (3d Cir. 1979) (answering question "When is a sale [of accounts receivable] not a sale, but rather a secured loan?" and holding that "district court did not err in determining that the true nature of the [accounts receivable] transaction . . . was a secured loan, not a sale."); *Lange v. Inova Cap. Funding, LLC (In re Qualia Clinical Serv., Inc.)*, 441 B.R. 325 (8th Cir. BAP 2011) (holding that contract for purchase and sale of debtor's accounts receivable was not true sales agreement but in nature of disguised financing agreement, pursuant to which debtor retained ownership interests in accounts despite its purported sale to capital funding company); *Shoot the Moon*, 635 B.R. 797 (considering 18 merchant cash advance contracts, applying a multipart framework for characterizing transactions, determining that

---

[73]   Ex. 3 at 37 ¶ 3.1.
[74]   Ex. 3 at 35 § 1.10.
[75]   Ex. 3 at 38.

merchant cash advance contracts were loans, and awarding usury damages); *AKF, Inc. v. W. Foot & Ankle Ctr.*, 632 F. Supp. 3d 66 (E.D.N.Y. 2022) (determining that revenue purchase agreement was a loan and unenforceable because of usury defense); *Kerr v. Commercial Credit Grp., Inc. (In re Siskey Hauling Co., Inc.)*, 456 B.R. 597, 600 and 607 (Bankr. N.D. Ga. 2011) ("FleetOne and Debtor entered into a 'Purchase Agreement' under which FleetOne agreed to purchase Debtor's accounts receivable"; "When a buyer of accounts receivable holds substantial recourse against the seller, thereby shifting all risk of non-collection on the seller, courts have routinely held the transaction to be a financing arrangement and not a sale."); *State of N.Y. v. Richmond Cap. Group LLC*, 2023 WL 6053768, at *1-2 (N.Y. Sup. Ct. Sept. 15, 2023) (considering "140 sample merchant cash advance agreements" and determining that "the MCAs were loans, not a legitimate purchase of accounts receivables") *with In re R&J Pizza Corp.*, 2014 WL 12973408, at *6 (Bankr. E.D.N.Y. Oct. 14. 2014) ("The Purchase Agreements represent a true sale and not a disguised financing arrangement."); *Hi Bar Cap. LLC v. Parkway Dental Servs., LLC*, 2022 WL 885723 (N.Y. Sup. Ct. Mar. 25, 2022) (considering three criteria — reconciliation, term, and recourse — and finding that agreement was not a loan).

Fortunately, the Debtor and the UST stipulated to characterization of the Westwood Agreements for purposes of Section 1182(1)(A) eligibility.  The parties agree that the Westwood Agreements are "loans."  "A loan means an advance from a lender to borrower that the borrower must repay."  *Salgado v. Colvin*, 2016 WL 1056561, at *2 (D. Kan. Mar. 16, 2016).  Given such stipulation, it is unnecessary for the Court to delve into a full analysis of the dichotomy between true sales and loans (including recourse and nonrecourse features) for the present dispute.  The Court simply accepts the stipulation that the Westwood Agreements are loans.[76]  And, importantly, the Debtor and the UST confirmed that the Debtor "agreed to repay" the loans.  More specifically, the Stipulated Facts state:

> Westwood loaned the Debtor $850,000.00.  In exchange, the Debtor agreed to repay $1,190,000 . . . .
>
> Westwood loaned the Debtor $275.000.00.  In exchange, the Debtor agreed to repay $393,250 . . . .
>
> Westwood loaned the Debtor $200,000.  In exchange, the Debtor agreed to repay $288,000 . . . .[77]

During closing argument, the Debtor suggested that there is no debt because the Debtor does not owe anything to Westwood.  But that argument runs completely counter to the Stipulated Facts.  The Debtor already acknowledged that it took out loans which it "agreed to repay."  For purposes of Section 1182(1)(A), "debt" means "liability on a claim."  11 U.S.C. § 101(12).  And, statutorily, "claim" means "right to payment,

---

[76]     The Court accepts the stipulation between the Debtor and the UST only as between those parties and only in relation to Section 1182(1)(A) eligibility.

[77]     Stip. Fact Nos. 8, 9 and 10; Stip. Facts at 4 n.7.

whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5). So, quite plainly, based upon the Stipulated Facts, the obligations under the Westwood Agreements constitute debts of the Debtor. Furthermore, the Debtor breached the Westwood Agreements by, among other things, diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[78] By diverting its receivables, the Debtor made it impossible for Westwood to collect such receivables. Westwood's last successful daily ACH withdrawal under the Westwood Agreements was on November 22, 2022.[79] Westwood declared a default, accelerated the debt, and sued the Debtor before the Petition Date to collect the debt.[80]

Perhaps the Debtor is suggesting that the debt should not count as debt because it is disputed and possibly unenforceable. Although the Debtor did not articulate such argument in detail, maybe the Debtor disputes the debt owed to Westwood based upon a usury defense. *See F.D.I.C. v. Ramirez-Rivera*, 869 F.2d 624, 626 (1st Cir. 1989) ("The defense of usury is an affirmative defense."); *AKF*, 632 F. Supp. 3d 66 (determining that revenue purchase agreement was a loan and unenforceable because of usury defense). The problem with that position is that the Section 1182(1)(A) calculation includes disputed debts. *Mazzeo*, 131 F.3d at 303 ("We cannot view a debt as contingent merely because the debtor disputes the claim . . . ."); *Hanson*, 275 B.R. at 596-97 ("The majority of courts considering the question have held that merely because a debtor disputes a debt, or has potential defenses or counterclaims that might reduce the creditors' actual collection, the debt is not thereby rendered 'contingent' or 'unliquidated.'") (quoting *In re Crescenzi*, 69 B.R. 64, 65 (S.D.N.Y.1986)); *Reader*, 274 B.R. at 896 (same); *Clark* 91 B.R. at 574 ("a debtor's dispute, defenses or counterclaims, do not affect the character and classification of a claim as being *liquidated*"). So, even if the Debtor may have a valid affirmative defense to the collection of the debt by Westwood, the amount of debt still goes toward the debt cap under Section 1182(1)(A).

Possibly, the Debtor means to question the amount of the debt owed to Westwood. As set forth above, in its Initial MOR, the Debtor identified that it owed a liability of $830,267.59 to Westwood. The Debtor used a slightly larger figure on its Initial Schedule D ($830,493.09) and checked the boxes for "contingent" and "unliquidated." Then, on Amended Schedule D, the Debtor simply listed the debt as "unknown" as well as "contingent" and "unliquidated." By substituting "unknown" in place of $830,493.09 (from Initial Schedule D), the Debtor engaged in a transparent manipulation designed to reduce debt and make Subchapter V eligibility more likely. The Debtor offered no evidence how or why the debt suddenly became "unknown." Such gambit will not work. The Court accepts the Debtor's own calculation that it owes a debt to Westwood in the amount of $830,493.09.

---

[78]   Stip. Fact No. 39.
[79]   Stip. Fact No. 11.
[80]   Stip. Fact No. 12; Exs. 4 and 5.

**(4)**      **The Westwood Debt Has Not Been Extinguished.**

Notwithstanding the existence of a $830,493.09 debt owed by the Debtor to Westwood, Westwood did not file a proof of claim in this bankruptcy case.  In the Response, the Debtor stated "the Amended Schedules reduce the amount of the claims for several MCA Lenders to zero due to their failure to timely file a proof of claim as required by Fed. R. Bankr. P. 3003(c)(2)."  It seems that the Debtor's recharacterization of the Westwood debt as "unknown" (which is different than "zero") is due to Westwood's failure to file a proof of claim.

In supposed support of its position, the Debtor refers only to Fed. R. Bankr. P. 3003(c)(2) which states:

> Any creditor . . . whose claim . . . is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim . . . within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for purposes of voting and distribution.

Plainly, Fed. R. Bankr. P. 3003(c)(2) does not assist the Debtor.  To paraphrase, Fed. R. Bankr. P. 3003(c)(2) means only that Westwood: (1) will not be able to vote if a Subchapter V plan of reorganization is circulated for voting; and (2) will not receive any distributions from the bankruptcy estate if a Subchapter V plan of reorganization is confirmed.  Fed. R. Bankr. P. 3003(c)(2) does not state, or even imply, that debt may be extinguished (or counted as zero) for purposes of Subchapter V eligibility by reason of a creditor failing to file a proof of claim.

More to the point, the Subchapter V debt cap is calculated as of the Petition Date.  11 U.S.C. § 1182(1)(A).  So, the Court "cannot look to post-petition events to determine the amount of the debt."  *Slack*, 187 F.3d at 1073.  *Cf. In re Bernhard*, 2018 WL 3738952, at *3 (Bankr. E.D. Wis. Aug. 3, 2018) ("Post-petition events such as reduction of claims do not affect determination of eligibility [under the Chapter 13 debt cap].").  So, even if the failure to file a proof of claim somehow extinguished the claim post-petition (which it does not), that would have no bearing on the amount of the debt as of the Petition Date for purposes of calculating Section 1182(1)(A) eligibility.  As one perceptive court noted when considering Chapter 13 eligibility:

> Eligibility for chapter 13 is not based upon postpetition events such as allowed claims, filed claims, or treatment of claims in a confirmed chapter 13 plan.  If such events determined eligibility for chapter 13, a debtor with claims exceeding the limits of chapter 13 could file a petition and hope to qualify if some creditors failed to file proofs of claim, notwithstanding the claims listed in schedules.  The plain language of section 109(e) does not permit debtors to

> employ such a strategy.  Likewise, a debtor may not
> intentionally gerrymander either the schedules or the
> treatment of claims in a chapter 13 plan to qualify for chapter
> 13.

*In re Smith*, 325 B.R. 498, 502 (Bankr. D.N.H. 2005).  Tellingly, the Debtor was unable to provide the Court with any legal authority supporting its position.  And, the Court rejects it.

### (5)     The Westwood Debt Is Not Contingent.

The Debtor contends that the Westwood debt is contingent.  As noted previously, "[a] debt is noncontingent when all events giving rise to liability occurred prior to the debtor's filing for bankruptcy."  *Hanson*, 275 B.R. at 596.  The debt owed to Westwood arose prior to the Petition Date based upon the Westwood Agreements.  Per the Stipulated Facts, Westwood "loaned" the Debtor an aggregate of $1,325,000.00 in 2022.[81]  Through the Westwood Agreements, the Debtor "agreed to repay" at least $1,871,250.00.[82]  The Debtor defaulted in its obligations well before the Petition Date by, among other things, diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[83]  By diverting its receivables, the Debtor made it impossible for Westwood to collect such receivables.  So, there is nothing contingent about it because the events giving rise to the Westwood obligations occurred prior to the Petition Date.  The Debtor has offered nothing to the contrary.

### (6)     The Westwood Debt Is Not Unliquidated.

The Debtor contends that the Westwood debt is unliquidated.  As explained above, "a debt is considered to be 'liquidated' if the amount is readily ascertainable."  *Hanson*, 275 B.R. at 596.  An obligation based on a contract (such as the Westwood Agreements) typically is liquidated.  *Barcal*, 213 B.R. at 1014 ("We hold that the key factor in distinguishing liquidated from unliquidated claims is not the extent of the dispute nor the amount of evidence required to establish the claim, but whether the process for determining the claim is fixed, certain, or otherwise determined by a specific standard.  This definition is in accord with the early distinction between contract and tort claims . . . .") (emphasis omitted); *Clark*, 91 B.R. at 574 ("a debt is deemed liquidated if '. . . the amount due is capable of ascertainment *by reference to an agreement* or by a single computation'").

The Westwood debt is liquidated because the process for determining the claim is fixed, certain, or otherwise determinable by a specific standard: the Westwood Agreements.  The Westwood Agreements recite the amount loaned by Westwood to the Debtor as well as the amount to be repaid by the Debtor.  As noted above, per the

---

[81]     Stip. Fact Nos. 8, 9, and 10; Ex. 3.
[82]     *Id.*
[83]     Stip. Fact No. 39.

Stipulated Facts, Westwood "loaned" the Debtor an aggregate of $1,325,000.00 in 2022.[84]  Through the Westwood Agreements, the Debtor "agreed to repay" at least $1,871,250.00[85] (plus, fees and costs).  Accordingly, the amount due can be readily calculated based upon the foregoing and subtracting what the Debtor already has paid to Westwood (plus adding contractual fees and costs).  The Debtor obviously has (or should have) records of what it paid to Westwood.[86]  The exercise is not hard.  In fact, the Debtor itself has demonstrated that the amount owed to Westwood is liquidated because the Debtor itself calculated the amount due.  On its Initial MOR (from its own Balance Sheet), the Debtor listed a debt owed to Westwood of $830,267.59.[87]  Then, in its Initial Schedule D, the Debtor identified almost the same number: $830,493.09.[88]  The Debtor's own math matches very closely to Westwood's calculation contained in its "Verified Complaint" filed against the Debtor before the Petition Date.[89]  Westwood demanded $874,946.37 plus $214,690.49 in attorneys' fees.  In any event, after the Eligibility Objection, the Debtor filed its Amended Schedule D changing the amount owed to Westwood to "unknown."  But that is just some nonsense designed to try to avoid the Section 1182(1)(A) debt cap.  So, the Court gives it no credence at all.  Instead, the Court gives the benefit of the doubt to the Debtor and accepts the $830,493.09 listed in Initial Schedule D, notwithstanding the slightly larger amount demanded by Westwood.

### (7)    The Westwood Debt Counts for the Section 1182(1)(A) Debt Cap.

Accordingly, the $830,493.09 owed by the Debtor to Westwood as of the Petition Date must be included in the Section 1182(1)(A) debt cap.

### b.    The NewCo Capital Group VI LLC Debt Must Be Counted Toward the Statutory Debt Cap.

### (1)    The NewCo Capital Group VI LLC Stipulations.

With respect to Merchant Cash Advance Creditor Newco Capital Group VI LLC ("NewCo"), the Debtor and the UST stipulated as follows:

> 13.    The Debtor entered into a merchant cash advance agreement with NewCo Capital Group ("NewCo") on June 24, 2022 (the "NewCo MCA").  See Exhibit 6.  Pursuant to the NewCo MCA, NewCo loaned the Debtor $500,000.  In

---

84    Stip. Fact Nos. 8, 9, and 10; Ex. 3.
85    *Id*.
86    The Debtor did not provide the Court with evidence of its specific payments to Westwood.  Since the Debtor bears the burden to prove its eligibility for Subchapter V, it should have done so if it somehow disputed its own prior calculations in the Initial MOR and Initial Schedule D.  In any event, the Debtor cannot make the Westwood debt "unliquidated" by refusing to do the math.
87    Docket No. 86 at 15.
88    Ex. 1 .
89    Ex. 5.

exchange, the Debtor agreed to repay $665,000 by authorizing NewCo to make weekly ACH withdrawals from the Debtor's designated bank account of $13,300 or 15% of the Debtor's future receipts. *Id.* at p. 1.

14.     NewCo's last successful ACH withdrawal under the NewCo MCA was on or about September 5, 2022.

15.     Pre-petition, NewCo asserted the Debtor defaulted on the NewCo MCA and purported to accelerate all amounts allegedly due under the NewCo MCA. *See* Exhibit 7.

16.     The proof of claim filed by NewCo is submitted as Exhibit 8.[90]

### (2)     The NewCo Agreement.

As set forth above, the Debtor entered into a contract with NewCo.  The NewCo MCA consists of a "Revenue Purchase Agreement," a "Merchant Agreement," a "Security Agreement and Guaranty."[91]  The parties also agreed to an "Appendix A: the Fee Structure" and to "ACH Authorization Forms."[92]  To summarize and simplify, the NewCo MCA provided that NewCo would buy 15% of the Debtor's "Future Receipts" for $500,000.00.  Then, NewCo would collect $13,300.00 per week of the "Future Receipts" from the Debtor (through a dedicated account) until NewCo recovered $665,000.00. So, NewCo provided $500,000.00 to the Debtor while the Debtor was obligated to repay $665,000.00 over time.

Delving into the text, the "Revenue Purchase Agreement" part of the NewCo MCA is very similar to the Westwood MCA No. 1 "Purchase Agreement."  And, the "Merchant Agreement (Terms and Conditions)" portion of the NewCo MCA is virtually identical to the "Secured Merchant Agreement (Terms and Conditions)" part of the Westwood MCA No. 1.  In fact, it is apparent to the Court that Westwood and NewCo used the same form "Terms and Conditions" except that Westwood identified itself as "WF" and NewCo identified itself as "NCG."  Given the extraordinary similarity of the NewCo MCA to the Westwood MCA No. 1, there is no need for the Court to quote the relevant passages again.  Suffice to say that the text of the NewCo MCA and the Westwood MCA No. 1 are the same for all material purposes (except in identification of the parties and amounts).

### (3)     The NewCo Debt is a Debt.

As with the Westwood debt, during closing argument (but not in the Response), the Debtor seemed to contend that it does not owe anything to NewCo — so there is no

---

[90]     Stip. Fact Nos. 13-16 (bolding and underlining removed).
[91]     Ex. 6.
[92]     *Id*.

debt.  For the same reasons already explained above with respect to the Westwood debt, the Court rejects the Debtor's argument about the NewCo debt.

The Debtor and the UST stipulated to characterization of the NewCo MCA for purposes of Section 1182(1)(A) eligibility.  The parties agree that the NewCo MCA is a "loan."[93]  "A loan means an advance from a lender to borrower that the borrower must repay."  *Salgado*, 2016 WL 1056561, at *2.  The Court accepts the stipulation that the NewCo MCA is a loan.[94]  And, importantly, the Debtor and the UST confirmed that the Debtor "agreed to repay" the loan.  More specifically, the Stipulated Facts state: "NewCo loaned the Debtor $500,000.  In exchange, the Debtor agreed to repay $665,000 . . . ."[95]  The foregoing is enough to establish the existence of a debt.  Furthermore, the Debtor plainly breached the NewCo MCA by, among other things, diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[96]  By diverting its receivables, the Debtor made it impossible for NewCo to collect such receivables.  NewCo's last successful weekly ACH withdrawal under the NewCo MCA was on September 5, 2022.[97]  NewCo declared a default, accelerated the debt, and sued the Debtor before the Petition Date to collect the debt.[98]  NewCo demanded $687,254.00.[99]

Perhaps the Debtor is suggesting that the debt should not count as debt because it is disputed and possibly unenforceable.  But, as already explained with respect to the Westwood debt, the Section 1182(1)(A) calculation includes disputed debts.  *Mazzeo*, 131 F.3d at 303; *Hanson*, 275 B.R. at 596-97; *Reader*, 274 B.R. at 896; *Clark* 91 B.R. at 574.  So, even if the Debtor may have a valid affirmative defense to the collection of the debt by NewCo, the amount of debt still goes toward the debt cap under Section 1182(1)(A).

Maybe the Debtor means to question the amount of the debt owed to NewCo.  As set forth above, in its Initial MOR, the Debtor identified that it owed a liability of $518,559.10 to NewCo.  The Debtor used a slightly larger figure on its Initial Schedule D ($518,700.00) and checked the boxes for "contingent" and "unliquidated."  Then, on Amended Schedule D, the Debtor listed the debt as $687,254.00 (which matches the amount asserted the NewCo pre-bankruptcy lawsuit).  Meanwhile, NewCo timely filed Proof of Claim No. 1-1 and asserted a claim in the amount of $687,254.00.[100]  NewCo Proof of Claim No. 1-1 is prima facia evidence of the validity and amount of the NewCo debt.  Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."); *Knize*, 210 B.R. at 778.  The Debtor did not introduce any evidence which

---

[93]    Stip. Fact No. 13; Stip. Facts at 4 n.7.
[94]    The Court accepts the stipulation between the Debtor and the UST only as between those parties and only in relation to Section 1182(1)(A) eligibility.
[95]    Stip. Fact No. 13.
[96]    Stip. Fact No. 39.
[97]    Stip. Fact No. 14.
[98]    Stip. Fact No. 15; Ex. 7.
[99]    Ex. 7.
[100]   Ex. 8.

would call the amount contained in NewCo Proof of Claim No. 1-1 into question. Accordingly, the Court accepts that the Debtor is indebted to NewCo in the amount of $687,254.00 as set forth on Amended Schedule D and NewCo Proof of Claim No. 1-1.

### (4)    The NewCo Debt Is Not Contingent.

The Debtor contends that the NewCo debt is contingent.  As noted previously, "[a] debt is noncontingent when all events giving rise to liability occurred prior to the debtor's filing for bankruptcy."  *Hanson*, 275 B.R. at 596.  The debt owed to NewCo arose prior to the Petition Date based upon the NewCo MCA.  Per the Stipulated Facts, NewCo "loaned" the Debtor $500,000.00 in 2022.[101]  Through the NewCo MCA, the Debtor "agreed to repay" at least $665,000.00.[102]  The Debtor defaulted in its obligations well before the Petition Date by, among other things, diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[103]  By diverting its receivables, the Debtor made it impossible for NewCo to collect such receivables.  So, the debt is not contingent because the events giving rise to the NewCo obligations occurred prior to the Petition Date.

### (5)    The NewCo Debt Is Not Unliquidated.

The Debtor contends that the NewCo debt is unliquidated.  As explained above, "a debt is considered to be 'liquidated' if the amount is readily ascertainable."  *Hanson*, 275 B.R. at 596.  An obligation based on a contract (such as the NewCo MCA) typically is liquidated.  *Barcal*, 213 B.R. at 1014.  Like the Westwood debt, the NewCo debt is liquidated because the process for determining the claim is fixed, certain, or otherwise determinable by a specific standard: the NewCo MCA.  The NewCo MCA recites the amount loaned by NewCo to the Debtor as well as the amount to be repaid by the Debtor.  As noted above, per the Stipulated Facts, NewCo "loaned" the Debtor $550,000.00 in 2022 and the Debtor "agreed to repay" at least $665,000.00 (plus, fees and costs).  Accordingly, the amount due can be readily calculated based upon the foregoing and subtracting what the Debtor already has paid to NewCo (plus adding contractual fees and costs).  The Debtor obviously has (or should have) records of what it paid to NewCo.[104]  In fact, the Debtor's Amended Schedule D matches NewCo Proof of Claim No. 1-1.

### (6)    The NewCo Debt Counts for the Section 1182(1)(A) Debt Cap.

Accordingly, the $687,254.00 owed by the Debtor to NewCo as of the Petition Date must be included in the Section 1182(1)(A) debt cap.

---

101    Stip. Fact No. 13; Ex. 6.
102    *Id.*
103    Stip. Fact No. 39.
104    The Debtor did not provide the Court with evidence of its specific payments to NewCo.  Since the Debtor bears the burden to prove its eligibility for Subchapter V, it should have done so if it disputes its own Amended Schedule D and NewCo Proof of Claim No. 1-1.  In any event, the Debtor cannot make the NewCo debt "unliquidated" by refusing to do the math.

c.   **The Cloudfund, LLC Debt Must Be Counted Toward the the Statutory Debt Cap.**

(1)   **The Cloudfund, LLC Stipulations.**

With respect to Merchant Cash Advance Creditor Cloudfund, LLC ("Cloudfund"), the Debtor and the UST stipulated as follows:

> 17.    The Debtor entered into a merchant cash advance agreement with Cloudfund LLC ("Cloudfund") on July 27, 2022 (the "Cloudfund MCA"). *See* Exhibit 9. Pursuant to the Cloudfund MCA, Cloudfund loaned the Debtor $400,000. In exchange, the Debtor agreed to repay $544,000 by authorizing Cloudfund to make weekly ACH withdrawals from the Debtor's designated bank account of $13,600 or 15% of the Debtor's future receipts. Id. at p. 1.

> 18.    Cloudfund's last successful ACH withdrawal under the Cloudfund MCA was on or about October 21, 2022.

> 19.    Pre-petition, Cloudfund asserted the Debtor defaulted on the Cloudfund MCA and purported to accelerate all amounts allegedly due under the Cloudfund MCA. *See* Exhibit 10.[105]

(2)   **The Cloudfund Agreement.**

As set forth above, the Debtor executed a contract with Cloudfund. The Cloudfund MCA consists of a "Future Receipts Sale and Purchase Agreement," a "Personal Guaranty of Performance," and an "ACH Authorization Form."[106] To summarize and simplify, the Cloudfund MCA provided that Cloudfund would buy 15% of the Debtor's "Future Receipts" for $400,000.00. Then, Cloudfund would collect $13,600.00 per week of the "Future Receipts" from the Debtor (through a dedicated account) until Cloudfund recovered $544,000.00. So, Cloudfund provided $400,000.00 to the Debtor while the Debtor was obligated to repay $544,000.00 over time.

The text of the Cloudfund MCA is not identical to the Westwood Agreements or the NewCo MCA. Cloudfund did not use the same form of Terms and Conditions. However, the Court has reviewed the Cloudfund MCA. In material substance, however, the transaction is similar to the Westwood Agreements and the NewCo MCA. Given the overall similarity, the Court will not quote the Cloudfund MCA at length. But a few points are worth special mention. Under the Cloudfund MCA, the following constitute an "Event of Default" (among others): "(a) Seller [the Debtor] interferes with Buyer's

---

[105]    Stip. Fact Nos. 17-19 (bolding and underlining removed).
[106]    Ex. 9.

36

[Cloudfund's] right to collect the Remittance Amount; . . . (c) Seller uses multiple depository accounts without prior written consent of Buyer; (d) Seller revokes the ACH Authorization; [and] (e) Seller changes its depositing account . . . ."[107]  Per the Cloudfund MCA, "If any Event of Default occurs . . . [t]he full undelivered Purchased Amount [$544,000.00] plus all fees and charges (including legal fees) assessed under this Agreement will become due and payable in full immediately."[108]

### (3)  The Cloudfund Debt is a Debt.

As with the Westwood and NewCo debts, during closing argument (but not in the Response), the Debtor seemed to contend that it does not owe anything to Cloudfund — so there is no debt.  For the same reasons already explained above with respect to the Westwood debt, the Court rejects the Debtor's argument about the Cloudfund debt.

The Debtor and the UST stipulated to characterization of the Cloudfund MCA for purposes of Section 1182(1)(A) eligibility.  The parties agree that the Cloudfund MCA is a "loan."[109]  "A loan means an advance from a lender to borrower that the borrower must repay."  *Salgado*, 2016 WL 1056561, at *2.  The Court accepts the stipulation that the Cloudfund MCA is a loan.[110]  And, importantly, the Debtor and the UST confirmed that the Debtor "agreed to repay" the loan.  More specifically, the Stipulated Facts state: "Cloudfund loaned the Debtor $400,000.  In exchange, the Debtor agreed to repay $544,000 . . . ."[111]  The foregoing is enough to establish the existence of a debt. Furthermore, the Debtor plainly breached the Cloudfund MCA by, among other things, diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[112]  By diverting its receivables, the Debtor made it impossible for Cloudfund to collect such receivables.  Cloudfund's last successful weekly ACH withdrawal under the Cloudfund MCA was on October 21, 2022.[113] Cloudfund declared a default, accelerated the debt, and sued the Debtor before the Petition Date to collect the debt.[114]  Cloudfund demanded $461,500.00 plus interest, fees, and costs.[115]  Cloudfund's pre-petition complaint against the Debtor contained a detailed itemization of the amount owed.  The Debtor was obligated to pay Cloudfund $544,000.00, but Cloudfund received only five weekly remittances of $13,600.00.[116] After a failed remittance, Cloudfund only received one other remittance for $14,500.00.[117]  So, the accelerated balance was $461,500.00 plus interest, fees, and costs.

---

[107]   Ex. 9 at 8-9.
[108]   *Id.* at 9.
[109]   Stip. Fact No. 17; Stip. Facts at 4 n.7.
[110]   The Court accepts the stipulation between the Debtor and the UST only as between those parties and only in relation to Section 1182(1)(A) eligibility.
[111]   Stip. Fact No. 17.
[112]   Stip. Fact No. 39.
[113]   Stip. Fact No. 18.
[114]   Stip. Fact No. 19; Ex. 10.
[115]   Ex. 10.
[116]   Ex. 10 at 36.
[117]   *Id.*

Perhaps the Debtor is suggesting that the debt should not count as debt because it is disputed and possibly unenforceable.  But, as already explained previously, the Section 1182(1)(A) calculation includes disputed debts.  *Mazzeo*, 131 F.3d at 303; *Hanson*, 275 B.R. at 596-97.  So, even if the Debtor may have a valid affirmative defense to the collection of the debt by Cloudfund, the amount of debt still goes toward the debt cap under Section 1182(1)(A).

Maybe the Debtor means to question the amount of the debt owed to Cloudfund. As set forth above, in its Initial MOR, the Debtor identified that it owed a liability of $447,778.50 to Cloudfund.  The Debtor used virtually the same amount its Initial Schedule D ($447,900.00) and checked the boxes for "contingent" and "unliquidated." The difference between the amount asserted by Cloudfund in its pre-petition lawsuit ($461,500.00) and the amount on Amended Schedule D can be easily reconciled.  The difference is $13,600.00 (which is one weekly payment required under the Cloudfund MCA).  According to the detailed itemization provided by Cloudfund, one weekly payment of $13,600.00 was "bounced" when the Debtor "SHUT DOWN" the remittance account on September 14, 2022.[118]  The Debtor did not provide contrary evidence but apparently did not account for the bounced payment.  So, based on the evidence, the amount owed to Cloudfund is $461,500.00.

### (4)      The Cloudfund Debt Has Not Been Extinguished.

Notwithstanding the existence of a $461,500 debt owed by the Debtor to Cloudfund, Cloudfund did not file a proof of claim in this bankruptcy case.  In the Response, the Debtor stated "the Amended Schedules reduce the amount of the claims for several MCA Lenders to zero due to their failure to timely file a proof of claim as required by Fed. R. Bankr. P. 3003(c)(2)."  That seems to be what the Debtor did to the Cloudfund debt which it listed as "$0.00" in Amended Schedule D.

As already discussed with respect to the Westwood debt, the Debtor's position lacks any merit.  The Cloudfund debt cannot be magically extinguished and then not counted toward the Section 1182(1)(A) cap solely by virtue of the Debtor's sleight of hand.
*See* Fed. R. Bankr. P. 3003(c)(2).  *See Slack*, 187 F.3d at 1073 (court "cannot look to post-petition events to determine the amount of the debt"); *Bernhard*, 2018 WL 3738952, at *3 ("Post-petition events such as reduction of claims do not affect determination of eligibility [under the Chapter 13 debt cap].");  *Smith*, 325 B.R. at 502 ("Eligibility for chapter 13 is not based upon postpetition events such as allowed claims, filed claims, or treatment of claims in a confirmed chapter 13 plan.").  Tellingly, the Debtor was unable to provide the Court with any legal authority supporting its position. And, the Court rejects it.

---

[118]      *Id*.

### (5)   The Cloudfund Debt Is Not Contingent.

The Debtor contends that the Cloudfund debt is contingent.  As noted previously, "[a] debt is noncontingent when all events giving rise to liability occurred prior to the debtor's filing for bankruptcy."  *Hanson*, 275 B.R. at 596.  The debt owed to Cloudfund arose prior to the Petition Date based upon the Cloudfund MCA.  Per the Stipulated Facts, Cloudfund "loaned" the Debtor $400,000.00 in 2022.[119]  Through the Cloudfund MCA, the Debtor "agreed to repay" at least $544,000.00.[120]  The Debtor defaulted in its obligations well before the Petition Date by, among other things, diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[121]  By diverting its receivables, the Debtor made it impossible for Cloudfund to collect such receivables.  So, the debt is not contingent because the events giving rise to the Cloudfund obligations occurred prior to the Petition Date.

### (6)   The Cloudfund Debt Is Not Unliquidated.

The Debtor contends that the Cloudfund debt is unliquidated.  As explained above, "a debt is considered to be 'liquidated' if the amount is readily ascertainable."  *Hanson*, 275 B.R. at 596.  An obligation based on a contract (such as the NewCo MCA) typically is liquidated.  *Barcal*, 213 B.R. at 1014.  Like the Westwood debt and the NewCo debt, the Cloudfund debt is liquidated because the process for determining the claim is fixed, certain, or otherwise determinable by a specific standard: the Cloudfund MCA.  The Cloudfund MCA recites the amount loaned by Cloudfund to the Debtor as well as the amount to be repaid by the Debtor.  As noted above, per the Stipulated Facts, Cloudfund "loaned" the Debtor $400,000.00 in 2022 and the Debtor "agreed to repay" at least $544,000.00 (plus, fees and costs).  Accordingly, the amount due can be readily calculated based upon the foregoing and subtracting what the Debtor already has paid to Cloudfund (plus adding contractual fees and costs).  The Debtor obviously has (or should have) records of what it paid to Cloudfund.[122]  In fact, Cloudfund performed the exercise and provided it to the Debtor in its pre-petition lawsuit.[123]  The Debtor has not contested Cloudfund's calculation.

### (7)   The Cloudfund Debt Counts for the Section 1182(1)(A) Debt Cap.

Accordingly, the $461,500.00 owed by the Debtor to Cloudfund as of the Petition Date must be included in the Section 1182(1)(A) debt cap.

---

[119]   Stip. Fact No. 17; Ex. 9.
[120]   *Id.*
[121]   Stip. Fact No. 39.
[122]   The Debtor did not provide the Court with evidence of its specific payments to Cloudfund.  Since the Debtor bears the burden to prove its eligibility for Subchapter V, it should have done so if there was a dispute.  In any event, the Debtor cannot make the Cloudfund debt "unliquidated" by refusing to do the math.
[123]   Ex. 10 at 36.

### d. The Ultra Funding, LLC Debt Must Be Counted Toward the Statutory Debt Cap.

### (1) The Ultra Funding, LLC Stipulations.

With respect to Merchant Cash Advance Creditor Ultra Funding, LLC ("Ultra Funding"), the Debtor and the UST stipulated as follows:

30.     The Debtor entered into a merchant cash advance agreement with Ultra Funding, LLC ("Ultra Funding") on September 7, 2022 (the "Ultra MCA No. 1"). Pursuant to the Ultra MCA No. 1, Ultra Funding loaned the Debtor $125,000. *See* Exhibit 18, pp. 41-53. In exchange, the Debtor agreed to repay $187,375 by authorizing Ultra Funding to make daily ACH withdrawals from the Debtor's designated bank account of $2,882.70 or 25% of the Debtor's future receipts. *Id.* at p. 41.

31.     The Debtor entered into a second merchant cash advance agreement with Ultra Funding on September 8, 2022 (the "Ultra MCA No. 2"). Pursuant to the Ultra MCA No. 2, Ultra Funding loaned the Debtor $50,000. See Exhibit 18, pp. 28-40. In exchange, the Debtor agreed to repay $74,950 by authorizing Ultra Funding to make daily ACH withdrawals from the Debtor's designated bank account of $1,248.17 or 25% of the Debtor's future receipts. *Id.* at p. 28.

32.     The Debtor entered into a third merchant cash advance agreement with Ultra Funding on October 21, 2022 (the "Ultra MCA No. 3"). Pursuant to the Ultra MCA No. 3, Ultra Funding loaned the Debtor $100,000. *See* Exhibit 18, pp. 15-27. In exchange, the Debtor agreed to repay $149,900 by authorizing Ultra Funding to make daily ACH withdrawals from the Debtor's designated bank account of $3,747.50 or 25% of the Debtor's future receipts. *Id.* at p. 15.

33.     The Debtor entered into a fourth merchant cash advance agreement with Ultra Funding, LLC on November 9, 2022 (the "Ultra MCA No. 4") (Ultra MCA No. 1, Ultra MCA No. 2, Ultra MCA No. 3, and Ultra MCA No. 4 referred to collectively as the "Ultra Agreements"). *See* Exhibit 18, pp. 1-14. Pursuant to the Ultra MCA No. 4, Ultra Funding loaned the Debtor $250,000. In exchange, the Debtor agreed to repay $374,750 by authorizing Ultra Funding to make daily ACH withdrawals from the Debtor's designated

40

bank account of $4,996.67 or 25% of the Debtor's future receipts. *Id.* at p. 1.

34.    Ultra Funding's last successful ACH withdrawal pursuant to the Ultra agreements was on or about November 21, 2022.

35.    The proof of claim filed by Ultra Funding is submitted as Exhibit 19.[124]

### (2)    The Ultra Funding Agreements.

As set forth above, the Debtor entered into four contracts with Ultra Funding: Ultra MCA No. 1, Ultra MCA No. 2, Ultra MCA No. 3, and Ultra MCA No. 4.[125]  Except for the dates and the amounts, the Ultra Agreements are identical to each other and based on the same form.  So, for ease of reference, the Court focuses on Ultra MCA No. 1.

The Ultra MCA No. 1 consists of a "Revenue Purchase Agreement," a "Security Agreement and Guaranty," an "Appendix A – Fee Structure," and an "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)."[126]  To summarize and simplify, the Ultra MCA No. 1 provided that Ultra Funding would buy 25% of the Debtor's "Future Receipts" for $125,000.00.  Then, Ultra Funding would collect $2,882.70 per day of the "Future Receipts" from the Debtor (through a dedicated account) until Ultra Funding recovered $187,375.00.  So, Ultra Funding provided $125,000.00 to the Debtor while the Debtor was obligated to repay $187,375.00 over time.

The text of the Ultra MCA No. 1 is not identical to the NewCo MCA or the Cloudfund MCA.  However, the Ultra MCA No. 1 hews very close to the Westwood Agreements.  The initial three paragraphs of the Ultra MCA No. 1 and the Westwood Agreements (titled: "Purchase and Sale of Future Receivables") are virtually identical with only the names and amounts changed.  The structure, paragraph sequencing, and text of the "Terms and Conditions" part of the Westwood Agreements and the Ultra MCA No. 1 are also almost identical.  In substance, the Ultra MCA No. 1 transaction is quite similar to the Westwood Agreements.  Given the overall similarity, the Court will not quote the Ultra MCA No. 1 at length.

### (3)    The Ultra Funding Debt is a Debt.

As with the Westwood, NewCo, and Cloudfund debts, during closing argument (but not in the Response), the Debtor seemed to contend that it does not owe anything to Ultra Funding — so there is no debt.  For the same reasons already explained above

---

[124]    Stip. Fact Nos. 30-35 (bolding and underlining removed).
[125]    Ex. 18.
[126]    Ex. 18 at 41-53.

with respect to the Westwood debt, the Court rejects the Debtor's argument about the Ultra Funding debt.

The Debtor and the UST stipulated to characterization of the Ultra Agreements for purposes of Section 1182(1)(A) eligibility.  The parties agree that the Ultra Agreements are "loans."  "A loan means an advance from a lender to borrower that the borrower must repay."  *Salgado*, 2016 WL 1056561, at *2.  The Court accepts the stipulation that the Ultra Agreements are loans.[127]  And, importantly, the Debtor and the UST confirmed that the Debtor "agreed to repay" the loans.  More specifically, the Stipulated Facts state:

> Ultra Funding loaned the Debtor $125,000.  In exchange, the Debtor agreed to repay $187,375 . . . .

> Ultra Funding loaned the Debtor $50,000.  In exchange, the Debtor agreed to repay $74,950 . . . .

> Ultra Funding loaned the Debtor $100,000.  In exchange, the Debtor agreed to repay $149,900 . . . .

> Ultra Funding loaned the Debtor $250,000.  In exchange, the Debtor agreed to repay $374,750 . . . .[128]

The foregoing is enough to establish the existence of a debt.  Furthermore, the Debtor plainly breached the Ultra Agreements and defaulted by, among other things, diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[129]  By diverting its receivables, the Debtor made it impossible for Ultra Funding to collect such receivables.  Ultra Funding's last successful weekly ACH withdrawal under the Ultra Agreements was on November 21, 2022.[130]

Perhaps the Debtor is suggesting that the debt should not count as debt because it is disputed and possibly unenforceable.  But, as already explained previously, the Section 1182(1)(A) calculation includes disputed debts.  *Mazzeo*, 131 F.3d at 303; *Hanson*, 275 B.R. at 596-97.  So, even if the Debtor may have a valid affirmative defense to the collection of the debt by Ultra Funding, the amount of debt still goes toward the debt cap under Section 1182(1)(A).

Maybe the Debtor means to question the amount of the debt owed to Ultra Funding.  As set forth above, in its Initial MOR, the Debtor identified that it owed a liability of $336,678.48 to Ultra Funding.  The Debtor used virtually the same amount in its Initial Schedule D ($334,769.98) and checked the boxes for "contingent" and

---

[127]    The Court accepts the stipulation between the Debtor and the UST only as between those parties and only in relation to Section 1182(1)(A) eligibility.
[128]    Stip. Fact Nos. 30, 31, 32, and 33.
[129]    Stip. Fact No. 39.
[130]    Stip. Fact No. 34.

"unliquidated." Later, the Debtor calculated the debt owed to Ultra Funding as $546,261.89 on its Amended Schedule D. Meanwhile, Ultra Funding timely filed Proof of Claim No. 19-1 and asserted a claim in the amount of $546,261.89.[131] Ultra Funding Proof of Claim No. 19-1 is prima facia evidence of the validity and amount of the Ultra Funding debt. Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."); *Knize*, 210 B.R. at 778. The Debtor has not introduced any evidence which would call the amount contained in Proof of Claim No. 19-1 into question. Accordingly, the Court accepts that the Debtor is indebted to Ultra Funding in the amount of $546,261.89 as set forth in Proof of Claim No. 19-1.

### (4) The Ultra Funding Debt Is Not Contingent.

The Debtor contends that the Ultra Funding debt is contingent. As noted previously, "[a] debt is noncontingent when all events giving rise to liability occurred prior to the debtor's filing for bankruptcy." *Hanson*, 275 B.R. at 596. The debt owed to Ultra Funding arose prior to the Petition Date based upon the Ultra Agreements. Per the Stipulated Facts, Ultra Funding "loaned" the Debtor an aggregate of $525,000.00 in 2022.[132] Through the Ultra Agreements, the Debtor "agreed to repay" at least $786,975.00.[133] The Debtor defaulted in its obligations well before the Petition Date by, among other things, diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[134] By diverting its receivables, the Debtor made it impossible for Ultra Funding to collect such receivables. So, the debt is not contingent because the events giving rise to the Ultra Funding obligations occurred prior to the Petition Date. The Debtor has offered nothing to the contrary.

### (5) The Ultra Funding Debt Is Not Unliquidated.

The Debtor contends that the Ultra Funding debt is unliquidated. As explained above, "a debt is considered to be 'liquidated' if the amount is readily ascertainable." *Hanson*, 275 B.R. at 596. An obligation based on a contract (such as the Ultra Agreements) typically is liquidated. *Barcal*, 213 B.R. at 1014. Like the Westwood, NewCo, and Cloudfund debts, the Ultra Funding debt is liquidated because the process for determining the claim is fixed, certain, or otherwise determinable by a specific standard: the Ultra Agreements. The Ultra Agreements recite the amounts loaned by Ultra Funding to the Debtor as well as the amounts to be repaid by the Debtor. As noted above, per the Stipulated Facts, Ultra Funding "loaned" the Debtor $525,000.00 in 2022 and the Debtor "agreed to repay" at least $786,975.00 (plus, fees and costs). Accordingly, the amount due can be readily calculated based upon the foregoing and subtracting what the Debtor already has paid to Ultra Funding (plus

---

[131]   Ex. 19.
[132]   Stip. Fact Nos. 30, 31, 32, and 33; Ex. 18.
[133]   *Id.*
[134]   Stip. Fact No. 39.

adding contractual fees and costs).  The Debtor obviously has (or should have) records of what it paid to Ultra Funding.[135]  The exercise is simple.

**(6)      The Ultra Funding Debt Counts for the Section 1182(1)(A) Debt Cap.**

Accordingly, the $546,261.89.00 owed by the Debtor to Ultra Funding as of the Petition Date must be included in the Section 1182(1)(A) debt cap.

**e.      The EBF Holdings, LLC Debt Must Be Counted Toward the Statutory Debt Cap.**

**(1)      The EBF Holdings, LLC Stipulations.**

With respect to Merchant Cash Advance Creditor EBF Holdings, LLC ("Everest"), the Debtor and the UST stipulated as follows:

> 24.      The Debtor entered into a merchant cash advance agreement with Everest Business Funding ("Everest") on August 24, 2022 (the "Everest MCA").  *See* Exhibit 14. Pursuant to the Everest MCA, Everest loaned the Debtor $150,000.  In exchange, the Debtor agreed to repay $208,500 by authorizing Everest to make daily ACH withdrawals from the Debtor's designated bank account of $1,042.50 or 15% of the Debtor's future receipts. *Id.* at pp. 1 and 11.

> 25.      Everest's last successful ACH withdrawal under the Everest MCA was on or about March 22, 2023.

> 26.      The proof of claim filed by Everest is submitted as Exhibit 15.[136]

**(2)      The Everest Agreement.**

As set forth above, the Debtor executed a contract with Everest.  The Everest MCA consists of a "Revenue Based Financing Agreement," and an "Agreement for Direct Deposits (ACH Credits) and Direction Collections (ACH Debits)."[137]  To summarize and simplify, the Everest MCA provided that Everest would buy 15% of the Debtor's "Future Receipts" for $150,000.00.  Then, Everest would collect $1,042.50 per day of the "Future Receipts" from the Debtor (through a dedicated account) until Everest

---

[135]      The Debtor did not provide the Court with evidence of it specific payments to Ultra Funding. Since the Debtor bears the burden to prove its eligibility for Subchapter V, it should have done so.  In any event, the Debtor cannot make the Ultra Funding debt "unliquidated" by refusing to do the math.

[136]      Stip. Fact Nos. 24-25 (bolding and underlining removed).

[137]      Ex. 14.

44

recovered $208,500.00.  So, Everest provided $150,000.00 to the Debtor while the Debtor was obligated to repay $208,500.00 over time.

Delving into the text, the text of the Everest MCA is not identical to the Westwood Agreements, the NewCo MCA, the Cloudfund MCA, or the Ultra Agreements.  Everest did not use the same form of Terms and Conditions.  However, the Court has reviewed the Everest MCA.  In material substance, the transaction is similar to the Westwood Agreements, the NewCo MCA, the Cloudfund MCA, and the Ultra Agreements.  Given the overall similarity, the Court will not quote the Everest MCA at length.  But a few points are worth special mention.  Under the Everest MCA, the following constitute an "Event of Default" (among others): "(a) Seller [the Debtor] intentionally interferes with Purchaser's [Everest] right to collect the Daily Payment . . . ."[138]  Per the Everest MCA, "If any Event of Default occurs . . . [t]he full uncollected Purchased Amount [$208,500.00] plus all fees (including legal fees) due under this Agreement will become due and payable in full immediately."[139]

### (3)    The Everest Debt is a Debt.

As with the Westwood, NewCo, Cloudfund, and Ultra Funding debts, during closing argument (but not in the Response), the Debtor seemed to contend that it does not owe anything to Everest — so there is no debt.  For the same reasons already explained above with respect to the Westwood debt, the Court rejects the Debtor's argument about the Everest debt.

The Debtor and the UST stipulated to characterization of the Everest MCA for purposes of Section 1182(1)(A) eligibility.  The parties agree that the Everest MCA is a "loan."[140]  "A loan means an advance from a lender to borrower that the borrower must repay."  *Salgado*, 2016 WL 1056561, at *2.  The Court accepts the stipulation that the Everest MCA is a loan.[141]  And, importantly, the Debtor and the UST confirmed that the Debtor "agreed to repay" the loan.  More specifically, the Stipulated Facts state: "Everest loaned the Debtor $150,000.  In exchange, the Debtor agreed to repay $208,500 . . . ."[142]  The foregoing is enough to establish the existence of a debt.  Furthermore, the Debtor plainly breached the Everest MCA by diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[143]  By diverting its receivables, the Debtor made it impossible for Everest to collect such receivables.  Everest's last successful weekly ACH withdrawal under the Everest MCA was on March 22, 2023.[144]

---

[138]    Ex. 14 at 7.
[139]    *Id*.
[140]    Stip. Fact No. 24; Stip. Facts at 4 n.7.
[141]    The Court accepts the stipulation between the Debtor and the UST only as between those parties and only in relation to Section 1182(1)(A) eligibility.
[142]    Stip. Fact No. 24.
[143]    Stip. Fact No. 39.
[144]    Stip. Fact No. 25.

Perhaps the Debtor is suggesting that the debt should not count as debt because it is disputed and possibly unenforceable.  But, as already explained with respect to the Westwood debt and others, the Section 1182(1)(A) calculation includes disputed debts. *Mazzeo*, 131 F.3d at 303; *Hanson*, 275 B.R. at 596-97; *Reader*, 274 B.R. at 896; *Clark* 91 B.R. at 574.  So, even if the Debtor may have a valid affirmative defense to the collection of the debt by Everest, the amount of debt still goes toward the debt cap under Section 1182(1)(A).

Maybe the Debtor means to question the amount of the debt owed to Everest. As set forth above, in its Initial MOR, the Debtor identified that it owed a liability of $196,021.70 to Everest.  The Debtor used a slightly larger figure on its Initial Schedule D ($196,075.00) and checked the boxes for "contingent" and "unliquidated."  Then, on Amended Schedule D, the Debtor listed the debt again as $196,075.00.  Later, Everest filed Proof of Claim No. 49-1 and asserted a claim in the amount of $187,125.00.[145] Everest Proof of Claim No. 49-1 is prima facia evidence of the validity and amount of the Everest debt.  Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."); *Knize*, 210 B.R. at 778.  Accordingly, the Court accepts that the Debtor is indebted to Everest in the amount of $187,125.00 as set forth on Everest Proof of Claim No. 49-1 (which amount is less than the Debtor's calculation).

### (4)   The Everest Debt Is Not Contingent.

The Debtor contends that the Everest debt is contingent.  As noted previously, "[a] debt is noncontingent when all events giving rise to liability occurred prior to the debtor's filing for bankruptcy."  *Hanson*, 275 B.R. at 596.  The debt owed to Everest arose prior to the Petition Date based upon the Everest MCA.  Per the Stipulated Facts, Everest "loaned" the Debtor $150,000.00 in 2022.[146]  Through the Everest MCA, the Debtor "agreed to repay" at least $208,500.00.[147]  The Debtor defaulted in its obligations well before the Petition Date by diverting all its receivables into a new business checking account at Canvass Credit Union starting October 31, 2022.[148]  By diverting its receivables, the Debtor made it impossible for Everest to collect such receivables.  So, the debt is not contingent because the events giving rise to the Everest obligations occurred prior to the Petition Date.

### (5)   The Everest Debt Is Not Unliquidated.

The Debtor contends that the Everest debt is unliquidated.  As explained above, "a debt is considered to be 'liquidated' if the amount is readily ascertainable." *Hanson*, 275 B.R. at 596.  An obligation based on a contract (such as the NewCo MCA) typically is liquidated.  *Barcal*, 213 B.R. at 1014.  Like the Westwood debt and the other MCA debts discussed above, the Everest debt is liquidated because the process for

---

[145]   Ex. 15.
[146]   Stip. Fact No. 24; Ex. 14.
[147]   *Id.*
[148]   Stip. Fact No. 39.

determining the claim is fixed, certain, or otherwise determinable by a specific standard: the Everest MCA. The Everest MCA recites the amount loaned by Everest to the Debtor as well as the amount to be repaid by the Debtor. As noted above, per the Stipulated Facts, Everest "loaned" the Debtor $150,000.00 in 2022 and the Debtor "agreed to repay" at least $208,500.00 (plus, fees and costs). Accordingly, the amount due can be readily calculated based upon the foregoing and subtracting what the Debtor already has paid to Everest (plus adding contractual fees and costs). The Debtor obviously has (or should have) records of what it paid to Everest.[149] The exercise is not hard. In fact, the Debtor's Amended Schedule D is close to Everest Proof of Claim No. 49-1.

### (6) The Everest Debt Counts for the Section 1182(1)(A) Debt Cap.

Accordingly, the $187,125.00 owed by the Debtor to Everest as of the Petition Date (as set forth on Everest Proof of Claim No. 49-1) must be included in the Section 1182(1)(A) debt cap.

### 5. Based on the Foregoing, the Debtor Plainly Exceeds the $7,500,000.00 Statutory Debt Cap — No Further Analysis Is Necessary.

Rather than analyze the claims of the remaining Merchant Cash Advance Creditors, the Court stops for a breath. At this stage, the Court already has determined that the following debts must be included for the Section 1182(1)(A) debt calculation:

| Creditor | Amount |
|---|---|
|  |  |
| Uncontested Debt | $3,890,899.66 |
| IRS | $   975,593.86 |
| Westwood | $   830,493.09 |
| NewCo | $   687,254.00 |
| Cloudfund | $   461,500.00 |
| Ultra Funding | $   546,261.89 |
| Everest | $   187,125.00 |
|  |  |
| Total | $7,579,127.50 |

So, the Debtor's debt plainly exceeded the $7,500,000.00 Section 1182(1)(A) cap as of the Petition Date. In the interests of preserving some remaining modicum of judicial economy, the Court will not engage in further detailed claim-by-claim analysis.

---

[149]     The Debtor did not provide the Court with evidence of its specific payments to Everest. Since the Debtor bears the burden to prove its eligibility for Subchapter V, it should have done so if it somehow disputes its own Amended Schedule D or Everest Proof of Claim No. 49-1. In any event, the Debtor cannot make the Everest debt "unliquidated" by refusing to do the math.

However, it is apparent to the Court that the debt greatly exceeds the statutory eligibility cap — the question is not close.  The Court notes just a few final observations:

- With respect to the "Uncontested Debt," the Court has accepted the stipulation between the Debtor and the UST that the Court should count the amounts listed in the Amended Schedule D and E/F for 57 claims totaling $3,890,899.66.  So be it.  However, it is apparent that the Debtor manipulated many such claims by reducing the amounts below the Initial Schedule D and E/F as well as below the amount of filed proofs of claim.  The Debtor has offered no evidentiary basis for the reductions.  So, the amount of the Uncontested Debt appears likely understated by hundreds of thousands of dollars.

- The Court did not examine the Merchant Cash Advance Creditor claims of Fox Capital Group, Inc., MYNT Advance, and Cannon Advance, LLC in detail yet.  Assuming that the contracts between the Debtor and Fox Capital Group, Inc., MYNT Advance, and Cannon Advance, LLC are similar to the Westwood Agreements, NewCo MCA, Cloudfund MCA, Ultra Funding Agreements, and Everest MCA and that the Stipulations between the Debtor and the UST are similar, it seems likely that these additional claims also would count toward the Section 1182(1)(A) debt cap.  If so, that would add hundreds of thousands of dollars of additional debt to the calculation.  And, there is another Merchant Cash Advance Creditor, BMT Capital Group, Inc., for which the Debtor simply listed the debt as "unknown" with no additional information.

- The Debtor improperly reduced the debt pool by eliminating several claims listed on Initial Schedules D and E/F (as contingent or unliquidated) for which the creditors subsequently did not file proofs of claim.  The Debtor followed that practice for several of the Merchant Cash Advance Creditors but also with respect to $118,487.62 of other claims listed on its Initial Schedules D and/or E/F.[150]  The Debtor simply reduced the amounts of such claims to "$0.00" or "unknown" on Amended Schedule D and/or E/F.  As set forth previously, there is no legal basis for the Debtor's actions.  Accordingly, the Debtor undercounted more than another hundred thousand dollars of debt.

- The Debtor characterized more than a million dollars of other claims (in addition to the claims of the IRS, the Merchant Cash Advance Creditors, and those creditors discussed above who did not file proofs of claim) as "contingent" or "unliquidated" so that such claims would not count toward the Section 1182(1)(A) debt cap.[151]  In some cases, the Debtor introduced evidence that the Debtor disputed such claims.  But, for the most part, the Debtor failed to establish that such claims were truly "contingent" or "unliquidated."  Under oath, the Debtor's Chief Executive Officer, Robert Michael Townsend, testified repeatedly that he did not know why many of the claims were recharacterized as "contingent" or "unliquidated."  For example, on Amended Schedule D, the Debtor listed Marlin Leasing Corporation as a creditor with a $57,285.00 claim which the Debtor characterized as "contingent" and "unliquidated."

---

[150]   Stip. Fact No. 5.

[151]   *See* Stip. Fact No. 43 (listing debts that are not merchant cash advances).

Marlin Leasing Corporation filed Proof of Claim No. 35-1 in the same amount ($57,285.00).[152]  Such claim is based on a contract (signed by Mr. Townsend) requiring 60 monthly payments of $1,030.00.  Proof of Claim No. 35-1 included a detailed computation of the amount due, including payments, charges, and fees.  When asked why Marlin Leasing Corporation's claim was characterized as "contingent" or "unliquidated," Mr. Townsend stated only that he was "not clear on the debt" and "did not know the agreement."  Similarly, the Debtor had two corporate credit cards with American Express.[153]  American Express filed two claims, both supported by the most recent account statements:  Proof of Claim No. 11-1 for $13,669.57 and Proof of Claim No. 17-1 for $13,972.06.  The Debtor characterized the American Express claims as "contingent" and "unliquidated" on Amended Schedule E/F.  But, when asked why such debts were listed as "contingent" and "unliquidated," Mr. Townsend swore that he had "no explanation," "no idea," and "can't answer."  The Debtor had another credit card with Capital One N.A.  Capital One N.A. filed Proof of Claim No. 16-1 for $418,085.36 in credit card charges.  On Amended Schedule E/F, the Debtor listed the claim as "unliquidated."  During examination by the UST, Mr. Townsend testified that he had no idea why the debt was characterized as "unliquidated."  On further examination by the Debtor's counsel, Mr. Townsend speculated that some of the items the Debtor purchased using the Capital One N.A. credit card might have been returned and a credit might be issued by the merchant.  But that is not a basis to classify the debt as "contingent" or "unliquidated."  There are more examples.  A lot more.  But, the point is that many hundreds of thousands of dollars of additional debt (possibly more than a million dollars) appears to have been wrongly characterized by the Debtor as "contingent" and/or "unliquidated."  The Court has already concluded that the Debtor engaged in such exercise in a blatant attempt to skirt the Subchapter V debt cap.

## VI.    Conclusion.

Congress enacted a $7,500,000.00 statutory debt cap for Subchapter V reorganizations.  11 U.S.C. §1182(1)(A).  The evidence establishes that the Debtor had "aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition" exceeding $7,500,000.00  Accordingly, the Debtor is not eligible for Subchapter V.  The Court sustains the Eligibility Objection and strikes the Debtor's Subchapter V Election.  The Court also denies confirmation of the Subchapter V Plan.  This bankruptcy case shall proceed as a standard Chapter 11 reorganization.

DATED this 21st day of March, 2024.    BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge

---

[152]   Ex. 22.
[153]   Exs. 24 and 26.